```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF MARYLAND

 3                       SOUTHERN DIVISION
    UNITED STATES OF AMERICA,      ) CRIMINAL
 4                                  ) NO. PJM-23-236
              Plaintiff,           )
 5                                  )
    v.                             )
 6                                  )
    TRISTYN TUTT,                  )
 7                                  )
              Defendant.           )
 8
                  TRANSCRIPT OF MOTIONS PROCEEDINGS
 9           BEFORE THE HONORABLE PETER J. MESSITTE
                  UNITED STATES DISTRICT JUDGE
10            TUESDAY, JANUARY 9; 2024; 2:10 P.M.
                      GREENBELT, MARYLAND
11  APPEARANCES:

12  FOR THE PLAINTIFF:

13           OFFICE OF THE UNITED STATES ATTORNEY
             BY:  ADAM K. AKE, ESQUIRE
14           6406 Ivy Lane
             Suite 800
15           Greenbelt, Maryland  20770
             (301) 344-4340
16
    FOR THE DEFENDANT:
17
             OFFICE OF THE FEDERAL PUBLIC DEFENDER
18           BY:  ELLIE MARRANZINI, ESQUIRE
             BY:  ERIC PILCH, ESQUIRE
19           6411 Ivy Lane
             Suite 710
20           Greenbelt, Maryland  20770
             (301) 344-0600
21
    Also Present: Katherine Benedict, ATF
22
             Renee A. Ewing, RMR, CRR - (301) 344-3227
23                Federal Official Court Reporter
                  6500 Cherrywood Lane, Suite 200
24                  Greenbelt, Maryland  20770

25      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
```

1                              - - - - -

2                          INDEX TO TESTIMONY

3

4    GOVERNMENT'S WITNESSES:

5    BRIAN GROCE                                           PAGE

6         Direct examination by Mr. Ake                     5
          Cross-examination by Ms. Marranzini              30
7
     ALEXANDER TUTT                                        PAGE
8
          Direct examination by Mr. Pilch                  91
9         Cross-examination by Mr. Ake                      95

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (Call to order of the Court.)

2              THE COURT:  Good afternoon, ladies and gentlemen.  Be

3    seated, please.

4              All right.  Call the case, please.

5              THE DEPUTY CLERK:  Calling Criminal Action No.

6    PJM-23-236, United States of America vs. Tristyn Tutt.  We are

7    here today for the purpose of a motions hearing.

8              Counsel, please identify yourselves for the record.

9              MR. AKE:  Good afternoon, Your Honor.  Adam Ake for

10   the United States.  I am joined at counsel table by ATF Special

11   Agent Katherine Benedict.

12             MS. MARRANZINI:  Good afternoon, Your Honor.

13   Assistant Federal Public Defender Ellie Marranzini, and with my

14   co-counsel, Eric Pilch, we are representing Tristyn Tutt, who

15   is seated to my right.

16             THE COURT:  All right.  Anything by way of opening,

17   or do you just want to get right into the case, Mr. Ake?

18             MR. AKE:  Your Honor, I have discussed it with

19   Ms. Marranzini, and the plan -- our plan is just to go ahead

20   and call the one witness in the case and then all the argument

21   afterwards.

22             THE COURT:  All right.  Are you ready?

23             MR. AKE:  Thank you, Your Honor.

24        At this time, the government will call Prince George's

25   County Police Officer Brian Groce.
```

1          THE COURT:  All right, sir.  If you will step right

2  up front here to be sworn by the clerk and then take the

3  witness stand.

4          THE DEPUTY CLERK:  All right.  Stand, please.  Raise

5  your right hand.

6           BRIAN GROCE, GOVERNMENT'S WITNESS, SWORN

7          THE DEPUTY CLERK:  Thank you.  You may put your hand

8  down.

9       Please state and spell your first and last name.

10          THE COURT:  Well, have a seat first.

11          THE DEPUTY CLERK:  Oh, okay.

12          THE COURT:  Now, before you go any further, Madam

13  Reporter, can you follow without audio?

14          THE COURT REPORTER:  Yeah.  I'll try.

15          THE COURT:  Do you have earphones so --

16          THE COURT REPORTER:  Can you talk into the --

17          THE DEPUTY CLERK:  Officer Groce.

18          THE COURT REPORTER:  That's perfect.

19          THE COURT:  You can hear?

20          THE COURT REPORTER:  Yes.

21          THE COURT:  All right.  Go ahead, Mr. Clerk, if you

22  want to ask him to state his name.

23          THE DEPUTY CLERK:  Please state and spell your first

24  and last name for the record.

25          THE WITNESS:  First name is Brian, B-r-i-a-n; last

1    name is Groce, G-R-O-C-E.

2            THE COURT:  All right, Mr. Ake.

3            MR. AKE:  Thanks.

4                    DIRECT EXAMINATION

5    BY MR. AKE:

6    Q.    Good afternoon, Officer Groce.

7    A.    Good afternoon.

8    Q.    So, which agency do you work for?

9    A.    Prince George's County Police Department.

10   Q.    And how long have you worked for Prince George's County?

11   A.    About five years now.

12   Q.    Okay.  And is this your -- is that your first job as a

13   police officer?

14   A.    Yes, it is.

15   Q.    Okay.  And, so, you said you joined the department five

16   years ago.

17         Was that to go to the Academy?

18   A.    Yes.

19   Q.    Okay.  And since you graduated from the Academy, what

20   kind of duties have you had?

21   A.    Upon graduating, I worked in a patrol capacity for about

22   three years.  Then I moved on to the Community Action Team

23   afterwards.

24   Q.    And what's the difference between standard patrol duties

25   and the Community Action Team?

Grace - Direct

1  A.    Standard patrol duties, responding to normal calls for
2  services.  Community Action Team usually provide or are given
3  assignments from a command staff to go into particular areas
4  that have high violence or crime activity going on.
5  Q.    Okay.  And in early 2023, were you already on the
6  Community Action Team by that time?
7  A.    Yes, sir.
8  Q.    Okay.  Now, draw your attention to March 13th, 2023.
9        Do you recall what you were doing the morning of that
10 day?
11 A.    Yes, sir.
12 Q.    And why does that jump out to you in terms of date wise?
13 A.    That particular morning, we were in the area of Parkway
14 Terrace and 4500 block of Silver Hill Road assisting
15 investigators looking for a missing person.
16 Q.    Okay.  So was it just members of your team that you were
17 working with that morning?
18 A.    No, sir.
19 Q.    Okay.  Who else were you working with?
20 A.    Our station investigators, gang unit, and members of our
21 CAT team and Community Engagement Team as well.
22 Q.    So there were -- they were all from Prince George's
23 County Police Department in one way or another, but this was
24 not a -- a normal team function?  This was something that was
25 larger?

Grace - Direct

1   A.    Yes.  All part of Prince George's County, but yes,

2   multiple different parts of different departments within the

3   agency.

4   Q.    Okay.  And when you said you were at Parkway Terrace,

5   what were you doing that morning specifically?

6   A.    There was a missing person that was already in the system

7   with our investigators, a missing person report.  We believed

8   that the investigators got word that the individual was

9   actually a possible homicide victim and was somewhere in one of

10  the vacant apartments in the area, so we searched about

11  20-something apartments looking for this victim.

12  Q.    Okay.  So, just to make sure that that's clear on the

13  record, you have searched, between the members of your team,

14  over 20 apartments that morning?

15  A.    Yes, sir.

16  Q.    Now, I am going to direct your attention to what's been

17  marked as Government's Exhibit 3, and I am putting that on the

18  screen now.

19        Do you recognize what's showing on the screen?

20  A.    Yes, sir.

21  Q.    And what are we looking at?

22  A.    That should be my in-car camera vehicle.

23  Q.    And what are the buildings that are surrounding the

24  vehicles on the screen?

25  A.    The Parkway Terrace apartment complex.

Grace - Direct

```
 1   Q.    And the vehicle that's directly in front of your
 2   windshield, do you recognize that vehicle?
 3   A.    Yes, sir.
 4   Q.    Is that also a police vehicle?
 5   A.    That's one of our unmarked police cruisers, yes.
 6              THE COURT:  What time of day is it, Officer?
 7              THE WITNESS:  This should be in the afternoon, so we
 8   probably were just getting done, so it's probably after 1:00.
 9              THE COURT:  1:00?
10              THE WITNESS:  1:00 -- yes.  After 1:00, sir.
11              THE COURT:  Okay.
12   BY MR. AKE:
13   Q.    All right.  I am going to play video Exhibit 3 now.
14         (Whereupon, a video was played in open court but not
15   reported.)
16   BY MR. AKE:
17   Q.    Now, I am stopping the video at about 21 seconds into
18   this elapsed time on the clip.
19         Do you see a vehicle in front of the gold police vehicle
20   that you identified a moment ago?
21   A.    Yes, sir.
22   Q.    Okay.  And do you recognize that white vehicle?
23   A.    Yes, sir.
24   Q.    How do you recognize that?
25   A.    That was the vehicle that we conducted a traffic stop on
```

1    with the defendant inside.

2    Q.    Okay.  And before ten seconds or so before this video

3    started, had you seen that vehicle before that you know of?

4    A.    Yes, sir.

5    Q.    Where had you seen that before?

6    A.    It was traveling the opposite side of the median on

7    Parkway Terrace going towards Hill Silver.

8    Q.    But you had only seen it just before --

9    A.    Oh, yes, sir.

10   Q.    -- just before you started following the vehicle on the

11   road?

12   A.    Correct.

13   Q.    Okay.  So this -- this wasn't a preplanned stop or --

14   that you had organized ahead of time, was it?

15   A.    Negative.

16   Q.    Okay.  All right.  What were -- what led up to the

17   decision, then, to effect a stop on this vehicle?

18   A.    We were just wrapping up or conducting what we were

19   looking for --

20              THE COURT:  A little louder, please.

21              MR. AKE:  Just make sure you speak directly into the

22   microphone.

23              THE WITNESS:  We were just completing the task of our

24   assignment, and we were about to start proactively patrolling

25   the area of 4500 block of Silver Hill Road, and we just -- this

1   was the first traffic stop we came upon.

2   BY MR. AKE:

3   Q.    Okay.  And what triggered your attention towards this

4   particular vehicle?

5   A.    As the vehicle was coming down Parkway Terrace towards

6   Silver Hill Road, I observed the vehicle having extremely dark

7   windshield -- window tinting material and having no front

8   license plate on the vehicle.

9   Q.    Okay.  Now, I am going to go ahead and keep playing this

10  video, Exhibit No. 3.

11        (Whereupon, a video was played in open court but not

12  reported.)

13  BY MR. AKE:

14  Q.    Actually, I am going to stop this exhibit for now.  I am

15  going to instead switch to Exhibit No. 1.

16        (Whereupon, a video was played in open court but not

17  reported.)

18  BY MR. AKE:

19  Q.    I am just pausing that at the beginning here.

20        Do you recognize this exhibit?

21  A.    Yes, sir.

22  Q.    And how do you recognize this exhibit?

23  A.    The top left corner, that's officer -- Detective

24  Katzenmeier's body camera.

25  Q.    Okay.  And was --

1          MS. MARRANZINI:  Your Honor, I might be getting a

2    little bit ahead of myself, but we are going to object to the

3    admission of this exhibit in this hearing as it's the body-worn

4    camera of a witness who isn't testifying currently and I

5    understand won't be testifying.

6          MR. AKE:  Okay.

7          THE COURT:  Well, is this once the stop is made?  I

8    am not sure -- what does it purport to be?

9          MR. AKE:  Your Honor, Officer Katzenmeier was

10   equipped with a body-worn camera.  All I am asking detective --

11   or Officer Groce to do is authenticate the -- the footage.  He

12   was present on the scene and he also listened to the radio

13   traffic.

14         THE COURT:  What is the point -- whose vehicle is

15   this and what -- what is happening?

16         MR. AKE:  So, Your Honor, the -- Officer Katzenmeier

17   was in the -- the vehicle directly in front of Officer Groce,

18   and he calls out the fact that the vehicle did not signal its

19   right turn at the stop sign.

20         THE COURT:  A stop sign that we have just looked at?

21         MR. AKE:  Yes, Your Honor.

22         THE COURT:  You stopped the tape twice, so I couldn't

23   tell whether there was a failure to stop because of the driver

24   or whether because you stopped the tape.

25         MR. AKE:  Your Honor, I will play a slow-motion

Groce - Direct

1  version of the -- of that video again, but this exhibit,

2  Officer Katzenmeier makes a radio call that Officer Groce

3  listened to, so --

4          THE COURT:  The radio call reveals what?

5          MR. AKE:  Officer Katzenmeier calls out that as he's

6  watching and he's following behind, that the vehicle does not

7  make a full stop, nor does it signal.

8          THE COURT:  Okay.  And is this transmitted to the

9  witness?

10          MR. AKE:  It is.  Yes, Your Honor.

11          THE COURT:  At what point?

12          MR. AKE:  It's over the radio, Your Honor.

13          THE COURT:  So this witness hears it on his radio?

14          MR. AKE:  Yes, Your Honor.

15          THE COURT:  Okay.  Well, that's what you need to

16  establish.

17          MR. AKE:  Right.

18          MS. MARRANZINI:  Your Honor, may we approach briefly

19  on this topic?

20          THE COURT:  Approach?

21          MS. MARRANZINI:  Yes.

22          THE COURT:  Okay.

23          MS. MARRANZINI:  Thank you.

24      (The following discussion was held at sidebar; all

25  counsel present.)

Groce - Direct

1      MS. MARRANZINI:  So --

2      THE COURT:  I don't know whether she can hear you or

3  not.

4      THE COURT REPORTER:  I can hear so far, Judge.

5      THE COURT:  Okay.  Very good.

6      THE COURT REPORTER:  Thank you.

7      MS. MARRANZINI:  So, we understand that the

8  government is going to play this clip in which you will hear

9  Officer Katzenmeier say something about the turn signal and the

10  stop sign, and I imagine this officer will testify that he

11  heard that comment.

12      THE COURT:  Okay.

13      MS. MARRANZINI:  And I understand that, typically,

14  hearsay is permitted in evidentiary hearings because we are not

15  in front of a jury, but I would object to the Court considering

16  the hearsay in this particular context because the statement

17  that Officer Katzenmeier makes goes to the very heart of one of

18  the issues that we are contesting, which is whether or not

19  there was a failure to stop at the stop sign or a failure to

20  put on a turn signal.  And so if the Court were to consider his

21  statement, this out-of-court statement for the truth, it's

22  essentially going right to the heart of our dispute.

23      And, additionally, I understand that this officer won't

24  be testifying, and if he would be testifying, there is a

25  significant amount of disciplinary history that he has incurred

Groce - Direct

1  that we would be challenging the -- the credibility of his

2  testimony with.  And so we would object on those two bases.

3        MR. AKE:  Your Honor, it's a present sense impression

4  recorded.  He -- he makes the statement contemporaneous with

5  viewing, so it meets one of the hearsay exceptions.

6        And in any case, the -- the witness who is authenticating

7  it listened to the radio call as Officer Katzenmeier was making

8  it and so would be able to comment under that -- he would be

9  able to authenticate it in any case, so --

10        THE COURT:  I realize this is an important issue, but

11  hearsay like this in terms of a traffic stop comes in all the

12  time.  It's the composite of what all the officers say.  And --

13        MS. MARRANZINI:  Yes.

14        THE COURT: -- this may not be clear now, but he said

15  it to this officer.  If he had any reasonable reliance on it --

16        MS. MARRANZINI:  Yes.

17        THE COURT: -- he would be able to testify about the

18  stop.  I mean, whether, in fact -- he makes the point.

19  Whether, in fact, he did go through the stop sign or not may

20  even be irrelevant, but I assume you have a tape that at least

21  suggests that?

22        MR. AKE:  Yes, Your Honor.

23        THE COURT:  Apart from that, he gets the report from

24  the other officer not on the scene, or wherever he is, that he

25  didn't stop.  He makes the necessary stop based on what he

Groce - Direct

1  hears from this officer.  That's a standard police practice.

2           MS. MARRANZINI:  Yes.  That part, and what, you know,

3  what Officer Groce does, we understand that can come in.  We

4  just wanted to raise and flag this concern about the Court

5  accepting the statement about the lack of turn signal for its

6  truth from Officer Katzenmeier who will not be subject to

7  cross-examination.

8           THE COURT:  Well, leave that aside.  So, what I am

9  saying is I am not even sure it has to be established as true

10 if the officer reasonably relies on it as part of the

11 composite.  It may not be true.

12      Now, you want to suggest that maybe it's a fabricated

13 falsehood as opposed to just a negligent remark, but, you know,

14 I am not sure what I'd do every time an officer makes a report,

15 and sometimes there are half a dozen who make reports.  The

16 arresting officer who hears about it makes the arrest,

17 basically.

18           MS. MARRANZINI:  Yes.

19           THE COURT:  I don't know that we have to establish

20 the truth of the matter, although I think the government is

21 prepared to try and do that.  So, I am not sure what more to

22 say to you.

23      The question is:  Did this officer effectively act

24 reasonably in doing so?  Did he act reasonably in reliance on

25 one of the composite pieces of information he got from another

1  officer?  And the answer, most certainly, yeah, I mean, unless

2  there is some reason to doubt that.  That's the evidence in the

3  docket.  If that's a problematic witness, I don't know where

4  you go.

5      Well, I note your concern.  I don't think there is more

6  to be said at this point, but you can say what you like.

7          MS. MARRANZINI:  Thank you, Your Honor.  We will have

8  further argument probably at the conclusion of this hearing

9  about the collective knowledge doctrine or the -- the fellow

10 officer rule and whether or not that applies in this

11 circumstance.

12         THE COURT:  Okay.  All right.  Fair enough.  We will

13 see where we go with the evidence.

14     (End of sidebar discussion.)

15         THE COURT:  Go ahead.

16         MR. AKE:  Thank you, Your Honor.

17 BY MR. AKE:

18 Q.   So, Officer Groce, when we dropped off there, you had

19 just authenticated -- or you just recognized the exhibit as

20 belonging to Officer Katzenmeier.  I am going to go ahead and

21 begin play on this.

22     (Whereupon, a video was played in open court but not

23 reported.)

24 BY MR. AKE:

25 Q.   Now, this is currently playing, but there is no audio.

Groce - Direct

```
 1          Is that normal?
 2   A.     Correct.  That's normal.
 3   Q.     And why is that normal?
 4   A.     There is usually no audio in the first 30 seconds before
 5   the officer activate their camera.
 6   Q.     Okay.  Could you make sure that you --
 7   A.     Oh, sorry.
 8   Q.     If you could just pull that closer.
 9   A.     I'm sorry.  30 seconds before the officer actually
10   activate their camera.
11          THE COURT:  You have to speak a little bit louder,
12   too.  I am not great on hearing, but --
13          THE WITNESS:  I'm sorry.
14          THE COURT: -- I am getting most of what you are
15   saying.
16          THE WITNESS:  There is 30 seconds before the officer
17   activates --
18          THE COURT:  Looks like the mic is working now?
19          THE DEPUTY CLERK:  Yes.
20          THE COURT:  Thank you.
21          THE WITNESS: -- activates their camera, there is
22   usually no audio recorded.
23   BY MR. AKE:
24   Q.     Okay.  So the video is buffering, essentially, and then
25   the audio kicks in --
```

Groce - Direct

```
 1  A.    Yes, sir.
 2  Q.    -- 30 -- the audio actually kicks in as -- as the
 3  emergency equipment is activated, but you get an extra bonus 30
 4  seconds of video.  Is that correct?
 5  A.    That's correct.
 6  Q.    All right.  So I am starting this right at 30 seconds
 7  here where the audio picks up.
 8        (Whereupon, a video was played in open court but not
 9  reported.)
10  BY MR. AKE:
11  Q.    And, Officer Groce, were you listening to the -- the
12  radio call at the time?
13  A.    Yes, sir.
14  Q.    Okay.  And what did the -- just for the record, what did
15  the recording or what did the radio call just say there?
16  A.    Officer Katzenmeier indicated the subject did not use his
17  turn signal and no stop at the stop sign.
18  Q.    Okay.  All right.  I am going to go back to show you
19  Government's Exhibit 2.
20        (Whereupon, a video was played in open court but not
21  reported.)
22  BY MR. AKE:
23  Q.    And, Officer Groce, do you recognize this exhibit?
24  A.    Yes, sir.
25  Q.    All right.  And what are we looking at?
```

1    A.    This is my in-car camera system.

2    Q.    Okay.  And is it playing at normal speed?

3    A.    No.  It's slowed down.

4    Q.    Okay.  And what's in the direct view -- in your view from

5    this footage?

6    A.    Officer Katzenmeier's vehicle, the tan unmarked cruiser;

7    then the subject's vehicle, the white Chevy Equinox, in front

8    of it.

9    Q.    And I am stopping it at the 33-second mark.

10         And what do you notice about the rear taillights of the

11   white Equinox?

12   A.    There is no turn signal being used while the vehicle is

13   making a right turn.

14   Q.    Do the rear lights look illuminated at all in this?

15   A.    No.

16   Q.    Now I will ask you to look at Officer Katzenmeier's

17   vehicle.

18         Are the lights illuminated in that?

19   A.    There is brake lights illuminated, yes.

20         (Whereupon, a video was played in open court but not

21   reported.)

22   BY MR. AKE:

23   Q.    Okay.  And I just advanced the -- the -- the video by

24   about three seconds of play.

25         Are there any lights illuminated on the Equinox at this

1   point?

2   A.    No.

3   Q.    Okay.

4         THE COURT:  Can you go back and just play the

5   sequence all the way through?  I am still not getting a picture

6   of whether the vehicle in front had stopped or whether it was

7   moving straight through.  Can you go back a little bit?

8         MR. AKE:  Absolutely, Your Honor.

9         THE COURT:  Just play it straight through before

10  Officer Katzenmeier stops and see what the white vehicle does.

11        (Whereupon, a video was played in open court but not

12  reported.)

13  BY MR. AKE:

14  Q.    So, Officer Groce, at this point in the video, is -- is

15  the white Equinox obscured by Officer Katzenmeier's vehicle?

16  A.    At this point, yes, sir.

17  Q.    Okay.  And, Officer Groce, at this point, does it come

18  into view?

19  A.    Yes, sir.

20        MR. AKE:  Your Honor, do you want to play that again?

21        THE COURT:  Play it one more time.

22        MR. AKE:  Your Honor, I will start it when the --

23  just before it zooms into the Equinox.

24        (Whereupon, a video was played in open court but not

25  reported.)

Groce - Direct

1              THE COURT:  All right.  Thank you.

2              MR. AKE:  Yes, Your Honor.

3    BY MR. AKE:

4    Q.    Officer Groce, I am now going to show you what's been

5    previously marked and submitted as Government's Exhibit 4.

6              (Whereupon, a video was played in open court but not

7    reported.)

8    BY MR. AKE:

9    Q.    Do you recognize this exhibit?

10   A.    Yes, sir.

11   Q.    What are we looking at?

12   A.    My body camera by the -- it also has my name in the top

13   left corner.

14   Q.    And is the audio situation on this similar where it's not

15   going to activate for 30 seconds?

16   A.    Yes, sir.

17             (Whereupon, a video was played in open court but not

18   reported.)

19   BY MR. AKE:

20   Q.    Officer Groce, I am stopping that at one minute 20

21   seconds elapsed time in Exhibit 4.

22             Just for the record, what reasons did you provide the

23   driver for the stop?

24   A.    I informed him that he failed to use his proper turn

25   signal and the tint on his front windshield.

Groce - Direct

1           THE COURT:  You did say the turn signal and the --

2  BY MR. AKE:

3  Q.    You said turn signal and what?

4  A.    Here on the body camera, I said failed to use his turn

5  signal and tint on his front windshield.

6  Q.    Okay.

7           THE COURT:  Okay.

8  BY MR. AKE:

9  Q.    Now, when you later wrote your report, did you cite the

10 vehicle's driver for an additional failure?

11 A.    Yes, sir.

12 Q.    What was that?

13 A.    It was three citations, I believe.  It was the failure to

14 use the turn signal, the tint on the vehicle, and I believe the

15 front -- failure to have a front license plate attached to the

16 vehicle.  I am not sure if that's a citation or a warning.  I'd

17 have to look at my notes.

18 Q.    I think that's accurate, but when you -- when you pulled

19 the driver over, had you noticed the -- the absence of the

20 front license plate initially?

21 A.    Yes, I did.

22 Q.    Okay.  All right.  What jurisdiction was the vehicle

23 actually registered in?

24 A.    Washington, D.C.

25 Q.    And does Washington, D.C. require front registration

1    plates?

2    A.    Yes, sir.

3         THE COURT:  And what?

4         THE WITNESS:  Yes, it does, sir.

5         MR. AKE:  He says it does require...

6    BY MR. AKE:

7    Q.    If they are permanent plates, correct?  If they are

8    temporary plates, it's just one?

9    A.    Correct.

10   Q.    Okay.  And did you know about D.C.'s requirements at the

11   time?

12   A.    Yes, sir.

13   Q.    Okay.  Are there states that do not require the display

14   of a front license plate?

15   A.    Yes, sir.  I am from Ohio, so Ohio just requires one.

16   Q.    Okay.  So you know there is differences between different

17   states?

18   A.    Yes, sir.

19        MR. AKE:  Okay.  All right.  I am going to start the

20   video again beginning at time hack one minute 26 seconds.

21        (Whereupon, a video was played in open court but not

22   reported.)

23        MR. AKE:  Okay.  All right.  I am stopping at one

24   minute 39 seconds.

25   BY MR. AKE:

Groce - Direct

```
 1   Q.    Just for the record, for the transcript that's produced
 2   of this, what just happened on the video?
 3   A.    I advised the driver that I was asking him to step
 4   outside of the vehicle.  I also advised him the reason I have
 5   him step outside of the vehicle is the strong odor of marijuana
 6   or cannabis emitting from the vehicle.
 7   Q.    Now, was -- what was the violation of law that you
 8   perceived at that point?
 9   A.    Possession of marijuana or cannabis inside.
10   Q.    Okay.  So, did that later become more legal or legal?
11   A.    I'm sorry?
12   Q.    Was that before it was legalized?
13   A.    Yes, sir.
14         MR. AKE:  Okay.  All right.  I am going to continue
15   to play beginning again at one minute 39 seconds.
16         (Whereupon, a video was played in open court but not
17   reported.)
18         MR. AKE:  All right.  Stopping the video at two
19   minutes 20 seconds.
20   BY MR. AKE:
21   Q.    You just said "George" there.
22   A.    Yes, sir.
23   Q.    Were you repeating that?
24   A.    Yes, sir.
25   Q.    Okay.  So what does "George" mean in your team?
```

 1   A.    For our team, we use that as an indicator advising other

 2   officers that there was a firearm or some type of arrest about

 3   to be made.

 4   Q.    Okay.  And what -- what did that cause you to do with

 5   regard to the -- the driver that you had escorted out of the

 6   vehicle?

 7   A.    Place the driver or the occupant that I have into custody

 8   at this time until I know what's fully going on at this time or

 9   at least detain them.

10         MR. AKE:  Okay.  I am going to continue playing from

11   two minutes 20 seconds.

12         (Whereupon, a video was played in open court but not

13   reported.)

14         MR. AKE:  All right.  Stopping the video at two

15   minutes and 39 seconds.

16   BY MR. AKE:

17         Now I am going to show you one last exhibit, what's been

18   marked as -- and previously submitted to the Court as

19   Government's Exhibit 5.

20         And just before I play that, do you recognize this

21   exhibit?

22   A.    Yes, sir.

23   Q.    All right.  And this is body-worn camera footage again.

24         Who does this belong to?

25   A.    Top left corner, it indicates Corporal Tucker's body

Groce - Direct

```
 1  camera.
 2  Q.    And is Corporal Tucker part of your -- your team?
 3  A.    Yes, sir.
 4         MR. AKE:  Okay.  I am going to skip ahead to
 5  approximately one minute into this recording and play from
 6  there.
 7         (Whereupon, a video was played in open court but not
 8  reported.)
 9  BY MR. AKE:
10  Q.    Just for the record, do you recognize what the video is
11  showing or who the video is showing at the one minute point?
12  A.    Yes, sir.
13  Q.    And who is the video showing?
14  A.    That's the defendant, Mr. Tutt, at this time in the
15  passenger seat.
16         MR. AKE:  Okay.  I am going to continue to play it.
17         (Whereupon, a video was played in open court but not
18  reported.)
19  BY MR. AKE:
20  Q.    All right.  Officer Groce, I am stopping that at one
21  minute 38 seconds.
22         Just for the record, did you hear what the defendant said
23  at that point?
24  A.    Yes, sir.
25  Q.    What did he say?
```

Groce - Direct

 1   A.    I do got a gun on me.

 2           MR. AKE:  Okay.  All right.  I am going to resume

 3   playing at 1:39.

 4       (Whereupon, a video was played in open court but not

 5   reported.)

 6           MR. AKE:  All right.  I am stopping the video at

 7   approximately 2:58.

 8   BY MR. AKE:

 9   Q.    Officer Groce, do you recognize what's in the defendant's

10   waist?

11   A.    Yes.  Protruding from the defendant's waist is a firearm

12   that we recovered.

13   Q.    And what part of the firearm were we looking at in this

14   video at 2:58?

15   A.    The extended magazine and the grip of the firearm at the

16   waistband.

17           MR. AKE:  Okay.  All right.  I am going to continue

18   playing.

19       (Whereupon, a video was played in open court but not

20   reported.)

21           MR. AKE:  Okay.  I am pausing the video at three

22   minutes 20 seconds.

23   BY MR. AKE:

24   Q.    Officer Groce, did you write the -- the report for this

25   incident?

1    A.    Yes, sir.

2    Q.    Okay.  And did you file the statement of probable cause?

3    A.    Yes, sir.

4    Q.    Now, what -- did you examine the firearm that -- that

5    Officer Tucker and the other officer just recovered from

6    Mr. Tutt?

7    A.    Yes, sir.

8    Q.    Okay.  And was that -- who manufactured that weapon?

9    A.    I'm sorry?

10    Q.    What was the manufacturer of the weapon?

11    A.    The firearm was a Polymer 80 ghost gun.

12    Q.    So it was a privately manufactured weapon; is that --

13    A.    Correct.  Yeah.

14    Q.    That's kind of the vernacular or what people call them?

15    A.    Yes, sir.

16    Q.    So it's a non-serial numbered --

17    A.    No serial number on the firearm, yes.

18    Q.    And you said it had an extended magazine?

19    A.    Yes, sir.

20    Q.    Okay.  Approximately how many rounds?

21    A.    A 30-round magazine.

22    Q.    And was it loaded?

23    A.    Yes, sir.

24    Q.    And was the -- was there a modification to the -- the

25    firearm?

Groce - Direct

1   A.    Yes, sir.  There was a rapid -- rapid trigger

2   modification on the firearm as well.

3   Q.    And what was the effect of that modification?

4   A.    It makes the firearm automatic.

5   Q.    Okay.  All right.  Now, did you charge the defendant in

6   Prince George's County with those violations?

7   A.    Yes, sir.

8   Q.    Okay.  Now, going back to the vehicle itself, did you

9   take a reading of the transparency of the -- the windows?

10  A.    Yes, sir.

11  Q.    And which -- which windows were you able to take a

12  reading on?

13  A.    I believe I did one on the front driver's side or

14  passenger with my tester meter -- laser meter tester, and it

15  was three percent.

16  Q.    And that's well below the -- the legal standard for

17  Maryland?

18  A.    Yes.  For Maryland, it requires at least to be 35 percent

19  or greater.

20  Q.    All right.  Did you have the capability of testing the

21  front windshield at that time?

22  A.    No.  We did not have the device at this time to test the

23  front windshield for tint.

24  Q.    Okay.  And did you ultimately issue any citations to the

25  driver?

Groce - Direct

```
 1  A.     Yes, sir.

 2  Q.     And what did you cite the driver with?

 3  A.     For tint on this vehicle, illegal tint on this vehicle;

 4  for the front registration not being displayed -- I am not sure

 5  if that was a warning or a citation -- but also for failure to

 6  use his turn signal before making a turn.

 7              MR. AKE:  All right.  I will pass the witness.

 8              THE COURT:  Are you going to offer the report?

 9              MR. AKE:  No, Your Honor.

10              THE COURT:  Okay.  All right.

11              MR. AKE:  I believe Ms. Marranzini plans to put it

12  in, though.

13              THE COURT:  All right.

14              MR. AKE:  Do you want me to leave this up here?

15              THE COURT:  That's fine.  Go ahead.  You can pass the

16  witness.

17                          CROSS-EXAMINATION

18  BY MS. MARRANZINI:

19  Q.     Good afternoon, Officer Groce.

20  A.     Good afternoon.

21  Q.     Just one moment while I connect my device.

22         Now, you testified that you were the author of the

23  statement of probable cause in this case.  Right?

24  A.     Yes, ma'am.

25  Q.     I understand that you also drafted an incident report in
```

1  this case?

2  A.    Incident report?

3  Q.    Is that a report that essentially has the same narrative

4  as the statement of probable cause?

5  A.    A case -- case report, yes.

6  Q.    A case report?

7  A.    Yes, ma'am.

8  Q.    And did you also draft the fusion report in this case?

9  A.    Fusion reports, no.  No, ma'am.

10  Q.    No?

11       Other than the statement of probable cause and the case

12  report, did you draft any other reports in this case?

13  A.    Conducted the residential search warrant, residential

14  search --

15  Q.    With respect to this traffic stop?

16  A.    Oh, no.  No, ma'am.  I'm sorry.

17  Q.    And did you testify in any hearings in state court with

18  respect to this traffic stop?

19  A.    Oh, not in state court.

20  Q.    Okay.  Have you testified in any hearings with respect to

21  this traffic stop?

22  A.    No.

23  Q.    And did you meet with federal agents or prosecutors in

24  preparation for this hearing?

25  A.    Yes, ma'am.

Proce    Cross

```
1   Q.    How many times?
2   A.    I think twice.
3   Q.    Okay.  And did you notice whether anybody took any notes
4   during those meetings?
5   A.    I'm sorry?
6   Q.    Did you notice whether anybody took any notes during
7   those meetings while you were speaking?
8   A.    Not that I can recall.  I am not too sure, ma'am.  I'm
9   sorry.
10  Q.    Okay.  Did you, yourself, send any emails or text
11  messages to anybody about the facts of this traffic stop?
12  A.    The facts of the traffic stop?  If it's -- if it was, it
13  was about, like, arranging meetings to go over their -- or to
14  arrange to go over the case file.
15  Q.    So scheduling --
16  A.    Yes, ma'am.
17  Q.    -- messages?
18        But about, like, narrating the facts or what happened or
19  any commentary about what happened?
20  A.    No, ma'am.
21  Q.    Okay.  Now, you mentioned that this traffic stop took
22  place while you were on a Community Action Team.  Right?
23  A.    Community Action Team, yes.  That's what I am currently a
24  part of.
25  Q.    And is the name of that team the Walters Lane Task Force?
```

Groce - Cross

```
 1   A.    That's what the combination of that group was called at
 2   that time.  The Community Action Team, the gang unit
 3   investigators, we were called the Walters Lane Task Force at
 4   that time.
 5   Q.    Okay.  But there have been other names of other Community
 6   Action Teams within Prince George's County Police Department.
 7   Right?
 8   A.    Yes, ma'am.
 9   Q.    And there are other officers that work on these teams
10   alongside you?
11   A.    Yes, ma'am.
12   Q.    And on that date, March 13th, 2023, there were other
13   officers working on the Community Action Team with you.  Right?
14   A.    We were working on assignment, so, yes, ma'am.  Yes,
15   ma'am.
16   Q.    Okay.  We saw that Officer Tucker was involved, we saw
17   Officer Katzenmeier, and there were several other officers
18   present at the stop as well.  Right?
19   A.    Yes, ma'am.
20   Q.    There was Officer Clark, Officer Guevara, and some
21   others?
22   A.    Yes, ma'am.
23   Q.    Is that right?
24         And you worked with these officers -- or you had worked
25   with these officers before that date?
```

Groce - Cross

1    A.      Yes, ma'am.

2    Q.      You had worked with them regularly?

3    A.      Some of them, I do not work with regularly, but Officer

4    Tucker, Guevara, my sergeant, we do work regularly.  That's a

5    part of our squad, yes.

6    Q.      Okay.  And you -- you kind of touched on this a bit, but

7    you -- you were describing how this type of team is different

8    from a typical patrol unit.  Right?

9    A.      Yes, ma'am.

10   Q.      And one of the reasons is that your mission is -- is to

11   patrol an area to detect crime?

12   A.      Detect or lower the amount of crime or violence going on

13   inside the area, or if there is a spike of crime in a

14   particular area, that's our assignment, or we will get tasked

15   to go into that area to reduce.

16   Q.      Okay.

17   A.      Yes.

18   Q.      And when -- and when you are working on one of these

19   units, you are not responding to calls for service?

20   A.      Unless it's some type of violent crime, like a shooting

21   or anything that's violent, we would assist Patrol with those

22   type of calls as well.

23   Q.      Okay.  You are patrolling proactively.  Right?

24   A.      Yes, ma'am.

25   Q.      Not usually reactively?

Croce - Cross

```
 1   A.    Yes, ma'am.  Mostly, yes.
 2   Q.    And -- and when you pulled over the -- the vehicle in
 3   question on -- on March 13th, you had not been given a call for
 4   service or any sort of tip --
 5   A.    No, ma'am.
 6   Q.    -- with respect to that car?
 7   A.    No, ma'am.
 8   Q.    You saw it and then you pulled it over?
 9   A.    Yes, ma'am.
10   Q.    Right?
11         One of the things that these crime suppression teams do
12   to further their -- their mission of suppressing crime is
13   traffic stops.  Right?
14   A.    Yes, ma'am.
15   Q.    It's one of the tools that you guys use?
16   A.    Yes, ma'am.
17   Q.    And sometimes when you conduct a traffic stop, you might
18   have a basis to search a vehicle or search a person.  Right?
19   A.    Yes, ma'am.
20   Q.    And then you might turn up other evidence of a different
21   crime that has nothing to do with the reason for the traffic
22   stop?
23   A.    Correct.
24   Q.    Which is what happened in this case.  Right?
25   A.    Correct.
```

Croce - Cross

```
 1   Q.     Are you familiar with the phrase "pretextual stop"?
 2   A.     Somewhat, yes.
 3   Q.     A pretextual stop is when you stop a car for one reason
 4   -- or you -- you offer a reason, but, really, you -- you are
 5   trying to get into the car for another reason?
 6   A.     Yes, ma'am.
 7   Q.     And that's one of the tools of these crime suppression
 8   teams, too.  Right?
 9   A.     We try to avoid that.  We always try to make sure that we
10   have a reason to stop a, you know, a vehicle.
11   Q.     Right.  As long as you have a reason that you can offer
12   to stop?
13   A.     Oh, yeah.
14   Q.     But you are not really trying to, you know, reduce the
15   incidence of -- of window tinting law or turn signal
16   violations.  Right?  You are really out there looking for more
17   significant stuff?
18   A.     Well, that's -- that's for everyone to say or determine,
19   you know.
20   Q.     But you are not, like, a traffic patrol unit.  Right?
21   You are not a traffic enforcement unit?
22   A.     We are able to issue citations just like our normal
23   traffic squad.
24   Q.     Right.  But your -- your specific mission, your specific
25   task --
```

Groce - Cross

1    A.    Our specific goal, yes, is to lower crime and get drugs

2    and firearms out of our community that may be illegal.  Yes.

3    Q.    Got you.  Okay.

4          And as we mentioned, that's exactly what happened on --

5    on March 13th?  The -- the car in question was pulled over for

6    traffic infractions?

7    A.    Yes, ma'am.

8    Q.    And the way that it was pulled over was by multiple

9    officers and multiple cars.  Right?

10   A.    Yes, ma'am.

11   Q.    We could see in the video that by the time you were

12   signalling to pull over the car, Katzenmeier's car was already

13   along the side of it.  Right?

14   A.    Yes.

15   Q.    And there was another police vehicle blocking it off in

16   the front?

17   A.    Okay.

18   Q.    Right?  Do you remember that?  I can play the video

19   again.

20   A.    Yeah.  You can play it back for me.

21   Q.    And we saw that there were multiple officers at the scene

22   of the traffic stop.  Right?

23   A.    Yes, ma'am.

24   Q.    In a typical, you know, traffic infraction, like a stop

25   sign infraction, there wouldn't be multiple police cars and

Cross

1    multiple police officers all teaming up to address that

2    infraction.  Right?

3    A.    Sometime it depends on the area, yes.

4    Q.    At the time that you pulled over that white vehicle, you

5    thought you might find something in addition to a traffic

6    infraction?

7    A.    I would not say that.  No, ma'am.

8    Q.    No?

9    A.    No, ma'am.

10   Q.    You -- you did say that you were at this apartment

11   complex, right, looking for a potential homicide victim?

12   A.    Yes, ma'am.

13   Q.    And then you had finished up that search for a homicide

14   victim, and then all of your units started pursuing this one

15   white car.  Right?

16   A.    Yes, ma'am.

17   Q.    And you all pulled it over together for a traffic -- for

18   three traffic infractions?

19   A.    Yes, ma'am.

20   Q.    That's a lot of resources to dedicate to a traffic

21   infraction.  Right?

22   A.    Well, all of the -- all of the officers were already in

23   that, you know, area together, so if we have a traffic stop,

24   most of the officers are just going to stay on the scene just

25   to make sure everything is just safely going on.

Croce - Cross

1   Q.    Okay.  So your testimony is that you expected to find

2   nothing in that car other than a traffic infraction?

3   A.    When we conduct traffic stops or something of that

4   nature, with the tint being extremely dark, I can't see inside.

5   I don't know what may be in there.  It can be -- you know, most

6   of the traffic stops we do conduct, 75 percent are just traffic

7   and the person are sent on their way.  So it's not always I am

8   hoping something, you know, is going to be in there or knowing

9   something is going to be inside.

10  Q.    Okay.  I didn't say -- I didn't think you knew something

11  would be inside, but I imagine you suspected that there might

12  be something else to this?

13  A.    No.  I can't say I can suspect.  No, ma'am.

14  Q.    Okay.  And you -- you testified that when you approached

15  the car, you noticed the smell of marijuana?

16  A.    Yes, ma'am.

17  Q.    And the -- the prosecutor asked you whether this took

18  place before marijuana was legalized in the State of Maryland.

19  Right?

20  A.    Yes, ma'am.

21  Q.    And you said that -- that it was?

22  A.    Yes, ma'am.

23  Q.    Marijuana was fully legalized in -- in Maryland this past

24  summer.  Right?

25  A.    Yes.  In July, July 1st.

Croce - Cross

```
 1   Q.    But --
 2            THE COURT:  Was it legalized, then, for the drivers
 3   of vehicles?
 4            MS. MARRANZINI:  That, I don't --
 5            THE COURT:  I don't think so.  There may be
 6   limitations.  I don't think that's a correct statement of the
 7   law, that it's fully legalized under all circumstances.  Can
 8   you drive under the influence?
 9            MS. MARRANZINI:  Possession of marijuana was
10   legalized.
11            THE COURT:  Can you drive under the influence of
12   marijuana under Maryland law today?  I don't think so.
13            MS. MARRANZINI:  I don't think it had an impact on --
14   on driving under the influence, but my question was just
15   whether possession --
16            THE COURT:  Well, in this circumstance where you
17   smell marijuana and you can't tie it to a driver or passenger
18   and it's a vehicle, have they violated Maryland law?
19        Let me restate that.  Is that legal, that the driver
20   could be driving under the influence?  Probably not.  Would
21   there be reasonable suspicion that he had been driving under
22   the influence?  Maybe.  Maybe it was the passenger.  Maybe it
23   was both of them.  How much certainty do you need?
24        Go ahead.  Ask another question.
25            MS. MARRANZINI:  We are not -- we are not -- we are
```

Cross

1  not making a -- a marijuana-based challenge in this case, Your

2  Honor.

3          THE COURT:  Well, you made the statement:  Are you

4  aware that it's fully lawful under Maryland law?

5          MS. MARRANZINI:  Understood, Your Honor.

6          THE COURT:  And I don't think -- that's not a correct

7  statement.  Go ahead.

8          MS. MARRANZINI:  I just meant that possession by

9  adults of marijuana was legalized.

10          THE COURT:  Well, that was not this case,

11  necessarily.

12          MS. MARRANZINI:  Understood.

13  BY MS. MARRANZINI:

14  Q.    Now, the reason -- turning to the -- to the basis of the

15  -- of the traffic stop, you testified that the reason that you

16  offered the driver when you pulled him over that we heard in

17  your body cam was, one, for the window tint and, two, for the

18  failure to put on a turn signal.  Right?

19  A.    Yes, ma'am.

20  Q.    And you testified that the window tint you had observed

21  prior to pulling over the car?

22  A.    Yes, ma'am.

23  Q.    You also had observed, prior to pulling over the car,

24  that the car had a D.C. license plate.  Right?

25  A.    Yes, ma'am.

Croce - Cross

1   Q.    And you had been instructed by Katzenmeier that there was

2   a failure to stop at the sign and failure to put on the turn

3   signal.  Right?

4   A.    The failure to stop at the stop sign, that's what Officer

5   Katzenmeier observed.  The failure to use a turn signal, I

6   could observe that as the vehicle was turning.

7   Q.    You observed that?

8   A.    Yes.  I could observe that, yes.

9   Q.    Okay.

10          THE COURT:  Did you do an electronic search of the --

11  or somebody on the license plate to see that it was attached to

12  that car?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  You did?

15          THE WITNESS:  No.  I don't believe I did.  I believe

16  one of the officers on the scene --

17          THE COURT:  Somebody else did?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  And it came back attached to that car?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Okay.

22  BY MS. MARRANZINI:

23  Q.    There were no concerns about the registration of the

24  vehicle.  Right?

25  A.    No, ma'am.

Groce - Cross

1    Q.    As far as you knew, it was lawfully registered to the

2    driver?

3    A.    Yes, sir.  I mean, yes, ma'am.  I'm sorry.

4    Q.    No problem.

5          So, I am going to show you the statement of probable

6    cause that you authored in this case.

7          MS. MARRANZINI:  Your Honor, this is Defense Exhibit

8    100.

9    BY MS. MARRANZINI:

10   Q.    Do you recognize -- do you recognize this report?

11   A.    Yes, ma'am.

12   Q.    And this is the statement of probable cause in this case.

13   Right?

14   A.    Yes, ma'am.

15   Q.    And it was authored by you, PFC Groce, No. 4210.  Right?

16   A.    Yes, ma'am.

17         MS. MARRANZINI:  Your Honor, I move to admit this

18   exhibit as Defense No. 100.

19         MR. AKE:  No objections.

20         THE COURT:  Proceed.

21   BY MS. MARRANZINI:

22   Q.    So, in this -- in this first substantive paragraph right

23   here that starts with "I, PFC Groce" -- I am going to zoom in a

24   little -- you wrote that you observed a white Chevrolet Equinox

25   with a Washington, D.C. registration plate being operated with

Croce - Cross

```
 1  unauthorized window tinting material and no front registration
 2  plate?
 3  A.    Yes, ma'am.  Yes, ma'am.
 4  Q.    And that was traveling on Parkway Terrace towards Silver
 5  Hill Road?
 6  A.    Yes, ma'am.
 7  Q.    You then wrote, "Officers observed the vehicle make a
 8  right turn off of Parkway Terrace onto Silver Hill Road."
 9  Right?
10  A.    Yes, ma'am.
11  Q.    I am going to pull up your -- did you refer to it as an
12  in-car camera?
13  A.    Yes, ma'am.
14  Q.    And this is Government's Exhibit 3.  And I am going to
15  play this again starting from the beginning.
16        (Whereupon, a video was played in open court but not
17  reported.)
18          MS. MARRANZINI:  So I am pausing it here at second 14
19  of the video.
20  BY MS. MARRANZINI:
21  Q.    And as you testified earlier, right now, it's
22  Katzenmeier's car that's in front of you.  Right?
23  A.    Yes, ma'am.
24  Q.    And at this point -- and this road that we are looking at
25  is Parkway Terrace.  Right?
```

Croce - Cross

1  A.    The road that we are currently on is Parkway Terrace.

2  The road that we are looking at coming upon is Silver Hill.

3  Q.    Okay.  So, at the -- at the end of this road, there is a

4  stop sign.  Right?

5  A.    Yes, ma'am.

6  Q.    And at the stop sign, you all are going to turn right?

7  A.    Yes, ma'am.

8  Q.    And that's Silver Hill?

9  A.    Yes.

10 Q.    Okay.  So now we are on Parkway Terrace.  At this point,

11 at second 14, the -- the view from your camera of the white

12 Chevy Equinox is completely obstructed.  Right?

13 A.    Yes.

14        MS. MARRANZINI:  Okay.  I am going to press play

15 again.

16     (Whereupon, a video was played in open court but not

17 reported.)

18        MS. MARRANZINI:  I am pausing it now at second 19.

19 BY MS. MARRANZINI:

20 Q.    Now, in this portion of the video, you can see the tops

21 of the Chevy Equinox.  Right?

22 A.    Correct.

23 Q.    But most of the back of the car is obstructed by

24 Katzenmeier's car.  Right?

25 A.    Yes, ma'am.

Croce - Cross

1  Q.    And at this point, the Chevy Equinox has approached the
2  stop sign?
3  A.    Yes.
4  Q.    And you can see at this exact second 19 that
5  Katzenmeier's car's brake lights are on?
6  A.    Correct.
7  Q.    Right?
8  A.    Correct.
9  Q.    And they are on because he's stopping his car?
10  A.    I cannot confirm that.
11  Q.    I can go back again and we can -- and we can watch a
12  couple seconds earlier.
13         MS. MARRANZINI:  I am going to start at second 16 and
14  press play.
15      (Whereupon, a video was played in open court but not
16  reported.)
17         MS. MARRANZINI:  So pausing it again.
18  BY MS. MARRANZINI:
19  Q.    We just saw the brake lights go on.  Right?
20  A.    Yes.
21         MS. MARRANZINI:  I am going to press play again.
22      (Whereupon, a video was played in open court but not
23  reported.)
24         MS. MARRANZINI:  Pausing it again.
25  BY MS. MARRANZINI:

Croce - Cross

1  Q.    We have just saw the brake lights again for another

2  second, and now they have turned off.  Right?

3  A.    Correct.

4         MS. MARRANZINI:  Pressing play again.

5     (Whereupon, a video was played in open court but not

6  reported.)

7         MS. MARRANZINI:  Stop again.

8  BY MS. MARRANZINI:

9  Q.    We just saw the brake lights on Katzenmeier's car go on

10  for a second and then turn off again.  Right?

11  A.    Correct.

12  Q.    So Katzenmeier's car is driving behind the white Chevy.

13  Right?

14  A.    Yes.

15  Q.    If the white Chevy comes to a stop, Katzenmeier either

16  has to also stop or he's going to crash into that car.  Right?

17  A.    Or the vehicle could slow down in front of him, and --

18  and you would still have to place -- place on your brakes as

19  well, ma'am.

20  Q.    That's true.

21  A.    Yes.

22  Q.    But your car, your -- at least your camera doesn't have

23  visibility of the lights of the white Chevy the entire time

24  that it's approaching the stop sign?

25  A.    That's correct.

Groce - Cross

```
 1   Q.    Okay.  Whose car would have had visibility of that is
 2   Katzenmeier's car?
 3   A.    Yes.  The officer that indicated the vehicle failed to
 4   stop and to have the turn signal.
 5   Q.    Right.  He has an unobstructed view of the car?
 6   A.    Correct.
 7   Q.    You have an obstructed view of the car?
 8   A.    As it's traveling down, yes.  As it's making the turn, I
 9   can see that it's not using their turn signal, correct.
10   Q.    Now, in this -- this camera is the in-car camera of your
11   cruiser.  Right?
12   A.    Yes, ma'am.
13   Q.    And it's situated kind of up and to the right compared to
14   where you are seated?
15   A.    In the middle of my cruiser.
16   Q.    In the middle of your cruiser?
17   A.    Yep.
18   Q.    It's not situated exactly where your eyeballs are?
19   A.    No.
20   Q.    Right?
21         So it offers a slightly different vantage point than what
22   your eyes would see?
23   A.    Correct.
24   Q.    Okay.  I am going to show you -- your car also has an
25   inward-facing camera.  Is that right?
```

Groce - Cross

```
 1   A.    Yes, ma'am.
 2          MS. MARRANZINI:  Your Honor, I am showing the witness
 3   Defense Exhibit 105.
 4          (Whereupon, a video was played in open court but not
 5   reported.)
 6   BY MS. MARRANZINI:
 7   Q.    Officer Groce, do you recognize this video?
 8   A.    Yes, ma'am.
 9   Q.    Is this the video footage from your inward-facing cruiser
10   camera?
11   A.    Yes, ma'am.
12   Q.    And is that you that we see?
13   A.    Correct.  Yes.
14          MS. MARRANZINI:  Your Honor, I move to admit Exhibit
15   105 --
16          MR. AKE:  No objection.
17          MS. MARRANZINI:  -- into evidence.
18          THE COURT:  Received.
19          MS. MARRANZINI:  I am going to press play for a few
20   seconds of this.
21          (Whereupon, a video was played in open court but not
22   reported.)
23   BY MS. MARRANZINI:
24   Q.    So, here we can see that your car is driving, it's
25   turning around.  Right?
```

1   A.    Yes, ma'am.

2          MS. MARRANZINI:  I am going to pause it really quick.

3   BY MS. MARRANZINI:

4   Q.    Is that because in order to pursue the white Chevy, you

5   had to do essentially a U-turn and go the other way down

6   Parkway Terrace?

7   A.    Yes, because there was a median between the two lanes.

8   Q.    Okay.  So did we just see you turn around on Parkway

9   Terrace towards Silver Hill Road?

10  A.    Correct.

11         MS. MARRANZINI:  Okay.  I have pressed play.

12         (Whereupon, a video was played in open court but not

13  reported.)

14         MS. MARRANZINI:  Pausing it right there at second 16.

15  BY MS. MARRANZINI:

16  Q.    We just saw you close your computer -- your car computer.

17  Right?

18  A.    Yes, ma'am.

19  Q.    And look down momentarily?

20  A.    Yes, ma'am.

21  Q.    Is that right?

22         MS. MARRANZINI:  Pressing play again.

23         (Whereupon, a video was played in open court but not

24  reported.)

25         MS. MARRANZINI:  Pausing it one more time at second

Groce - Cross

```
 1   21.
 2   BY MS. MARRANZINI:
 3   Q.    And here we see you looking at the driver's side window.
 4   Right?
 5   A.    Yes, ma'am.
 6         MS. MARRANZINI:  Pressing play one more time.
 7         (Whereupon, a video was played in open court but not
 8   reported.)
 9         MS. MARRANZINI:  Pausing it again.
10   Your Honor, I am showing the witness Defense Exhibit 109
11   on the document camera.  I am going to turn it this way.
12   BY MS. MARRANZINI:
13   Q.    Do you recognize this image, Officer Groce?
14   A.    Yes, ma'am.
15   Q.    Is this a still image from your cruiser camera or your
16   car camera?
17   A.    Yes, it is.
18   Q.    Okay.  And it's a little bit less clear, but we can see
19   right here this car is Katzenmeier's.  Right?
20   A.    Yes.
21   Q.    And in front of that would have been the -- the white
22   Chevy Equinox?
23   A.    Correct.
24         MS. MARRANZINI:  Your Honor, I move to admit 109 into
25   evidence.
```

Groce - Cross

```
 1              MR. AKE:  No objection.
 2              THE COURT:  It's received.
 3   BY MS. MARRANZINI:
 4   Q.    I am showing the witness Defense 110.
 5         This is another still image from your cruiser camera; is
 6   that right?
 7   A.    Correct.
 8   Q.    A couple seconds further down the road.
 9         And we see again Katzenmeier's car, right, in front of
10   you?
11   A.    Correct.
12   Q.    And at this point still, it's obstructing your view of
13   the white Chevy.  Right?
14   A.    Yes.
15              MS. MARRANZINI:  I move to admit 110.
16              THE COURT:  Proceed.
17   BY MS. MARRANZINI:
18   Q.    I am showing the witness Defense 111.
19         This is another still image from your cruiser camera.  Is
20   that right?
21   A.    Yes.
22   Q.    A bit further down the road.  Is that right?
23   A.    Yes.
24              MS. MARRANZINI:  Your Honor, I move to admit 111.
25              THE COURT:  Received.
```

Cross

```
 1  BY MS. MARRANZINI:
 2  Q.    And at this point, which is time stamped 13:52:29, you
 3  can see that Katzenmeier's brake lights are illuminated.
 4  Right?
 5  A.    Yes.
 6  Q.    Showing the witness Defense 112.
 7        Is this another still from your cruiser camera.  Is that
 8  right?
 9  A.    Yes.
10  Q.    And at this point, you are seeing the white Chevy start
11  to turn.  Right?
12  A.    Correct.
13        MS. MARRANZINI:  Your Honor, I move to admit 112.
14        THE COURT:  All right.  Proceed.
15  BY MS. MARRANZINI:
16  Q.    And from your camera's perspective, at this point, as the
17  car is already turning from the stop sign, right, you can see
18  just one side of the brake lights?  You cannot see both?
19  A.    I'm sorry?
20  Q.    In this image right here, and this is consistent with
21  what we saw in the video, the car is obstructed, the white car
22  is obstructed?
23  A.    Correct.
24  Q.    But you can see one side of the brake lights?
25  A.    I can see the right side of the vehicle, yes.
```

Groce - Cross

```
 1    Q.    You can't see the left side?

 2    A.    Correct.  That's correct.

 3    Q.    And at this point, the car is already turning?

 4    A.    He is not turning.  He is about to turn, yes.

 5    Q.    So, he would have to be accelerating to keep moving down

 6    the road.  Right?

 7    A.    I'm sorry?

 8    Q.    Once you have -- if you have stopped at a stop sign, or

 9    even if you have slowed down at a stop sign and you are about

10    to turn, then you have to accelerate?

11    A.    Okay.

12    Q.    Right?  To keep going?

13    A.    Yes.

14    Q.    And once you accelerate, your brake lights would no

15    longer be on.  Right?

16    A.    I am not really understanding your question, but I guess

17    yes, if you are accelerating, your brake lights aren't on at

18    the same time, no.

19    Q.    Yeah.

20          THE COURT:  You know, the -- just looking at the

21    citation, it's not the stop that's charged here.  It's the

22    failure to give the signal.

23          MS. MARRANZINI:  That's right.

24          THE COURT:  Okay.

25          MS. MARRANZINI:  The failure to turn.
```

1          THE COURT:  I just want to be clear on that.

2          MS. MARRANZINI:  Yes.  I am clear on that.

3          THE COURT:  I didn't see a signal on when I looked at

4    the tape earlier.  That's what I am not sure what you are

5    asking the witness, whether he saw the stop or not.

6          MS. MARRANZINI:  Yeah.  Well, that -- that was in

7    response to the government's questions about whether he stopped

8    at the stop sign, but we are also focusing on whether there was

9    a turn signal on or whether it was visible.

10         THE COURT:  Okay.  I -- I am not sure I am seeing the

11   same video that I looked at three times with Mr. Ake.  I am not

12   sure whether that's what you are referring to?

13         MS. MARRANZINI:  Yes.

14         THE COURT:  Okay.

15         MS. MARRANZINI:  The -- the one you saw with Mr. Ake,

16   there was one that was regular speed, and then there was one

17   that was slow motion speed.

18         THE COURT:  There is one that seems to show that

19   there is no signal on as he's turning.  Whether he stopped

20   before that or not, leave aside.  I don't know that that is the

21   focus.  But -- and I am wondering whether you are playing that

22   video.  That's why I asked to look at it several times.

23         MS. MARRANZINI:  Yes.  I will go back and play it

24   again, Your Honor.

25         THE COURT:  Okay.

1    BY MS. MARRANZINI:

2    Q.    And just going back to the -- to the witness -- to

3    Defense Exhibit 111, we -- we looked at this one.

4          So, in this one, we see that Katzenmeier's brake lights

5    are on.  Right?

6    A.    In this picture, I can't really tell.  It appears so.

7    Q.    Okay.  I can go back to the video so we can see it real

8    clear.

9    A.    Okay.

10   Q.    And he's behind the -- the white Chevy.  Right?

11   A.    Yes, ma'am.

12   Q.    And at this point, the white Chevy's brake lights are

13   completely -- or turn signals and brake lights are completely

14   obscured by Katzenmeier's car.  Right?

15   A.    I agree.

16   Q.    And the timestamp on this is 13:52:29.  Right?

17   A.    Correct.

18   Q.    Now, looking back at Exhibit 114, this is from your

19   inward cruiser cam.  This is 13:52:29, so it's the exact same

20   timestamp.

21         And at this moment, we see that your eyes are looking

22   down and you are closing your car computer.  Right?

23   A.    Correct.

24   Q.    I am going to show you one more still image.

25              MS. MARRANZINI:  Your Honor, I am showing the witness

Croce - Cross

1    Defense 116.

2    BY MS. MARRANZINI:

3    Q.    Do you recognize this as being a still image from your

4    body-worn camera?

5    A.    Yes.

6    Q.    Okay.  And you can see -- it's kind of dark, but right

7    here, you can see your hand right on the computer?

8    A.    Yes.

9    Q.    And we see the same date and time frame of what we have

10   been discussing thus far.  Right?

11   A.    Yes.

12           MS. MARRANZINI:  Your Honor, I move to admit Defense

13   116.

14           THE COURT:  Proceed.

15   BY MS. MARRANZINI:

16   Q.    And this still shows the position of -- right here

17   (indicating), this is your car camera.  Right?

18   A.    Yes.

19   Q.    That's your cruiser camera.

20           And you are sitting back here behind the -- driving

21   behind the steering wheel.  Right?

22   A.    Yes, ma'am.

23   Q.    And, so, this camera is to the right and up from where

24   you are --

25   A.    Yes, ma'am.

Cross

1    Q.    -- from where your viewpoint is --

2    A.    Mm-hmm.

3    Q.    -- and it's to the right of your rearview mirror?  So it

4    -- it offers a different viewpoint than what you are able to

5    see.

6         Going back to the video.  So this is Government's Exhibit

7    3, and this is your cruiser camera video, and I am pressing

8    play.

9         (Whereupon, a video was played in open court but not

10    reported.)

11         MS. MARRANZINI:  Pausing again.

12    BY MS. MARRANZINI:

13    Q.    At this moment, second 15, you cannot see the white Chevy

14    Equinox and you cannot see its turn signals or brake lights.

15    Right?

16    A.    Correct.

17         MS. MARRANZINI:  Pressing play again.

18         (Whereupon a video was played in open court but not

19    reported.)

20         MS. MARRANZINI:  Pressing pause.

21    BY MS. MARRANZINI:

22    Q.    At this point, the Chevy Equinox -- and we are at second

23    18 -- has approached the stop sign, and you can see

24    Katzenmeier's brake lights illuminated, but your vision of the

25    Chevy's turn signals or brake lights is obstructed.  Right?

Cross

1   A.    How do we know it's at the stop sign at this time?  Or is
2   it next to the SUV that's not at the stop sign or the red car?
3   Q.    Excuse me?
4   A.    Was it next to that SUV or the other parked car behind
5   the SUV?  How do we know that it's at the stop sign?
6   Q.    You don't -- okay.
7         So you can't tell whether the white Chevy Equinox is at
8   the stop sign at this point?
9   A.    Not at this moment.
10  Q.    Because you can't see it?
11  A.    Correct.
12  Q.    Okay.
13  A.    It could be slowing down, yes.
14  Q.    Okay.  And you can't see its turn signal?
15  A.    Correct.
16  Q.    So if its turn signal were on right now, you wouldn't be
17  able to see it?
18  A.    That's correct.
19  Q.    Katzenmeier would be able to see it?
20  A.    Correct.
21            MS. MARRANZINI:  Pressing play again.
22        (Whereupon, a video was played in open court but not
23  reported.)
24  BY MS. MARRANZINI:
25  Q.    At this point -- I paused it at second 19 -- your view,

Cross

```
 1  again, of the turn signals and the brake lights remains
 2  obstructed?
 3  A.    Yes.
 4  Q.    And by "your view," I am referring to your camera's view
 5  which is slightly to the right of your view.  Right?
 6  A.    Yes, ma'am.
 7            MS. MARRANZINI:  Pressing play again.
 8        (Whereupon, a video was played in open court but not
 9  reported.)
10            THE COURT:  That right there.
11            MS. MARRANZINI:  Pausing it right there at second 20.
12  BY MS. MARRANZINI:
13  Q.    At this point, your camera has visibility of one of the
14  lights?
15  A.    Yes, ma'am.
16  Q.    Right?
17        As it's turning?
18  A.    Yes, ma'am.
19  Q.    And at this specific second, the light is not
20  illuminated.  Right?
21  A.    Correct.
22            MS. MARRANZINI:  I am going to press play one more
23  time.
24        (Whereupon, a video was played in open court but not
25  reported.)
```

Croce - Cross

```
 1              MS. MARRANZINI:  Pausing it again just one second
 2   later.
 3   BY MS. MARRANZINI:
 4   Q.    Your view of the lights on the Chevy is now obstructed by
 5   this other car that's parked there.  Right?
 6   A.    Is it my view or the -- my camera view?
 7   Q.    The camera's view.  The camera's view was obstructed.
 8   Right?
 9   A.    The camera's view.  Yes.
10   Q.    So we have just watched the entirety of this what would
11   be a turn?
12   A.    Yes.
13   Q.    For almost the entire time, your camera's view is almost
14   entirely obstructed as to the turn signals on this car.  Right?
15   A.    Correct.
16   Q.    And we are talking about a turn signal that blinks on and
17   off.  Right?
18   A.    Yes.
19   Q.    If a turn signal is on, sometimes it's illuminated and
20   sometimes it's off?
21   A.    Yes, ma'am.
22   Q.    On, off, on, off.  Right?  So, if we are pausing the
23   video, at any given moment, the turn signal could be on or it
24   could be off.  Right?
25   A.    Yes, ma'am.
```

Cross

```
 1   Q.    Okay.  Do you -- do you wear contact lenses?

 2   A.    Yes, ma'am.

 3   Q.    You do?

 4   A.    Yes, ma'am.

 5   Q.    Are you nearsighted or farsighted?

 6   A.    I forgot the -- what eye.  It's been a while.

 7         THE COURT:  We are getting very far afield,

 8   Ms. Marranzini.

 9         MS. MARRANZINI:  Your Honor, he was testifying about

10   his visibility of something that we --

11         THE COURT:  Well --

12         MS. MARRANZINI: -- we proffer is -- is difficult to

13   see.

14         THE COURT:  I know, but you want to attack composite,

15   you have got the other officer's statement that he saw it.

16   It's supposed to be 100 feet before the turn, continuously

17   before the turn.  You got an officer who is not here who said

18   that's what I saw.  And then as the turn is being made, it

19   isn't illuminated, but I am not sure what this officer's

20   eyesight or personal perception does to change that

21   proposition.

22         MS. MARRANZINI:  Okay.

23         THE COURT:  And I just don't know where we go with

24   this.  It's an interesting point, but I don't know that he's

25   claiming to have seen the full stop the full 100 feet before
```

Groce - Cross

1   the turn, so I don't know where we go with his eyesight.

2            MS. MARRANZINI:  Understood, Your Honor.

3   BY MS. MARRANZINI:

4   Q.    And just to be clear, Officer Groce, you -- you don't

5   claim that you were able to see the turn signals on the white

6   Chevy Equinox for a full 100 feet before it turned, do you?

7   A.    State that again, ma'am.  I'm sorry.

8   Q.    Throughout the 100 feet preceding the turn, you don't

9   claim that you saw the --

10  A.    During the 400 feet, no.  But as the vehicle turned, I

11  saw that it didn't have a turn signal, that's correct.

12  Q.    But 100 feet prior to the turn, you couldn't see?

13           THE COURT:  No.  I think it said continuously before

14  the turn.

15           MS. MARRANZINI:  It does.  I am just clarifying that

16  this officer doesn't claim to have had visibility for 100 feet

17  before the turn.

18           THE COURT:  Well, are you asking him:  At any time

19  did he observe the vehicle, at the point of the turn, not have

20  its turn signal on?  Are you asking him that?  I think his

21  answer is different from the way you are phrasing the question.

22           MS. MARRANZINI:  I am asking him -- I am clarifying

23  with him that he doesn't claim to have had visibility for 100

24  feet prior to the turn.

25           THE COURT:  Well, you are saying "100 feet prior to

Croce - Cross

1  the turn."  The statute is 100 feet into the turn, if you will.

2  You are saying you have to have it on but that you don't have

3  to have it on when the turn is made?

4       But let me be clear.  At any time did you see no signal

5  being given at the -- at the point of the turn?

6            THE WITNESS:  No.  I did not see a signal being given

7  at any point in time -- any point in time during the time the

8  vehicle was making a turn.

9            THE COURT:  All right.

10 BY MS. MARRANZINI:

11 Q.   At any point did you have the visual ability to see the

12 turn signal for more than one second at a time before that car

13 turned?

14 A.   Yes, ma'am.  You said before the car turned?  I am sorry.

15 Q.   We just went through the video several times and pointed

16 out all these instances where the turn signal would have been

17 obscured by Katzenmeier's car.

18 A.   Correct.

19 Q.   And the way that we were pausing and starting, pausing

20 and starting, it didn't look to me like you ever had more than

21 like half a second of visibility of the turn signal before it

22 turned?

23 A.   Yeah.  And that's as you are pausing, but as we played

24 the video before with the AUSA, we could clearly see the

25 vehicle wasn't having a turn signal as it was making the turn.

Cross

```
 1  Q.    We will do it again.
 2  A.    Yes, ma'am.
 3        MS. MARRANZINI:  I am pressing play from second 15.
 4        (Whereupon a video was played in open court but not
 5  reported.)
 6        THE WITNESS:  During that time, it didn't have a turn
 7  signal, ma'am.
 8  BY MS. MARRANZINI:
 9  Q.    My question is whether at any point prior to the turn,
10  you had visibility of the turn signal for more than one second?
11  A.    Well, the citation I provided is the continuous use of a
12  turn signal while making a turn.
13        THE COURT:  And you did or did not see --
14        THE WITNESS:  I did not see.
15        THE COURT:  That's what I thought you said.
16  BY MS. MARRANZINI:
17  Q.    You did not see the turn signal.  Right?
18  A.    I do not see a turn signal being utilized on the vehicle
19  as it makes the turn, ma'am.
20        THE COURT:  He did not see it on.
21        MS. MARRANZINI:  Right.
22  BY MS. MARRANZINI:
23  Q.    But you also couldn't see the car throughout the entire
24  100 feet prior to its turn?
25  A.    I understand what you are trying to get me to say, ma'am,
```

Groce - Cross

```
 1   but I said it the best I can.  I'm -- I'm sorry if I -- I am
 2   not sure how --
 3             THE COURT:  I think I understand.  He didn't see it
 4   most of the time, and at the point of the turn, he did see the
 5   -- he didn't see the signal on.  One way to say it is there was
 6   no signal on, as I perceived it, in that last turn.  I think we
 7   are getting...
 8   BY MS. MARRANZINI:
 9   Q.    I am showing the witness Exhibit 101.
10         Do you recognize the map, Officer Groce?
11   A.    Yes.  I see that's Parkway Terrace street, yes.
12   Q.    And is that the -- the street that this all began on
13   before the turn took place?
14   A.    Yes.  Somewhere within this area, yes.
15   Q.    I have a -- a further out view, too.
16             MS. MARRANZINI:  Your Honor, I move to admit
17   Defendant's 101.
18             THE COURT:  All right.
19   BY MS. MARRANZINI:
20   Q.    I am showing the witness Defendant's 102.
21         This is a zoomed-out map that also shows Parkway Terrace.
22   Right?
23   A.    Yes, ma'am.
24   Q.    And so right here is Parkway Terrace Drive.  Correct?
25   A.    Yes, ma'am.
```

Groce - Cross

1    Q.    And this intersection with Silver Hill Road is the right

2    turn that we have been talking about.  Right?

3    A.    Yes, ma'am.

4    Q.    So, here, where Parkway Terrace meets Silver Hill Road,

5    there is a stop sign?

6    A.    Yes, ma'am.

7    Q.    And at that stop sign, you have to turn right?

8    A.    Yes, ma'am.

9    Q.    You cannot go straight?

10   A.    That's correct.  You can't go straight.

11   Q.    And you cannot turn left?

12   A.    Correct.

13   Q.    And if you wanted to get back to Suitland Parkway over

14   here, you would have to turn right on Silver Hill Road and then

15   make a U-turn.  Right?

16   A.    That's correct.

17   Q.    Okay.

18           THE COURT:  How are we doing?

19           MS. MARRANZINI:  We were just discussing that at this

20   stop sign, the only option is to turn right.  There is no

21   possibility of going straight or turning left.

22   BY MS. MARRANZINI:

23   Q.    Now, the transportation code -- you are familiar with the

24   transportation code.  Right?

25   A.    Yes, ma'am.

Cross

1    Q.    And you are familiar with the code sections that were the

2    citations that you gave to the driver of the car that day.

3    Right?

4    A.    Yes, ma'am.

5    Q.    And the -- the one for use of a turn signal is Maryland

6    Code Section 21-604.  Is that right?

7    A.    I believe so.  I don't want to quote the numbers.  I'm

8    sorry.

9    Q.    I am going to put the statute up on the screen for you.

10         Does that look right?

11   A.    Yes.

12              THE COURT:  That's part D.

13              MS. MARRANZINI:  Yes.  That's right.

14   BY MS. MARRANZINI:

15   Q.    The -- the Court -- the judge and we were discussing this

16   100 feet requirement.  Right?

17   A.    Yes, ma'am.

18   Q.    And that's under subsection (d), which says, "When

19   required, a signal of intention to turn right or left shall be

20   given continuously during at least 100 feet traveled"?

21   A.    Yes, ma'am.

22   Q.    Right?

23         And if you look right above that, it says, "Signal

24   required prior to turning vehicle" under subsection (c), which

25   says, "A person may not, if any other vehicle might be affected

cross

1  by the movement, turn a vehicle until he gives an appropriate

2  signal in the manner required by this statute."  Is that right?

3  A.    Yes.  That's what it says there.

4  Q.    I want to talk a little bit about what happened after the

5  traffic stop.

6        So, we already saw the footage from a couple of different

7  cameras and established that when you pulled over the car, your

8  car goes behind it.  Right?

9  A.    Yes, ma'am.

10 Q.    Katzenmeier's car comes to the side.  Right?

11 A.    I am not too sure without the video of everyone's

12 positioning besides mine.

13 Q.    We will keep playing from your cruiser cam which we had

14 paused at second 22 --

15 A.    Okay.

16 Q.    -- and see what happens during the stop.

17        MS. MARRANZINI:  I am pressing play now on

18 Government's Exhibit 3.

19        (Whereupon, a video was played in open court but not

20 reported.)

21 BY MS. MARRANZINI:

22 Q.    I want to go back, actually, one second.

23        So, here -- I just paused at second 33 -- we have a -- a

24 slightly different situation.  The white Chevy Equinox is in

25 front of Katzenmeier's car and you are behind Katzenmeier's

Croce - Cross

 1  car.   Right?

 2  A.     Yes, ma'am.

 3  Q.     And the Chevy is about to make a U-turn on -- is that

 4  Silver -- we are now on Silver Hill Road.  Right?

 5  A.     Yes.

 6  Q.     And he is about to make a U-turn to go back towards

 7  Suitland?

 8  A.     Suitland Parkway, yes.

 9  Q.     Suitland Parkway?

10  A.     Yes.

11  Q.     Yes.  Okay.

12         So I am going to press play, and I want you to look at

13  the brake lights on the white car and the gold car.

14         (Whereupon, a video was played in open court but not

15  reported.)

16              MS. MARRANZINI:  I just paused it.  So, I paused it

17  at second 35.

18  BY MS. MARRANZINI:

19  Q.     So you can see kind of a snippet on the right-hand side

20  of one of the lights on the white Chevy.  Right?

21  A.     Correct.

22  Q.     And it looks kind of whitish or yellowish maybe?  What

23  color would you say?

24  A.     Red.

25  Q.     Huh?

1    A.    You mean red?

2    Q.    On the Chevy?

3    A.    Yes.  The brake light is red.

4         MS. MARRANZINI:  Let me go back one more second.

5    Press play.

6         (Whereupon, a video was played in open court but not

7    reported.)

8         MS. MARRANZINI:  Pressing pause right now.

9    BY MS. MARRANZINI:

10   Q.    Do you see the -- the light on the Chevy?

11   A.    Correct.  The brake light?

12   Q.    The right light.  I am not sure what it's called.  The

13   far right light that's kind of like whitish.

14   A.    That's a brake light, ma'am.

15   Q.    The brake light?

16   A.    Yes, ma'am.

17   Q.    Okay.  And behind it, we can also see Katzenmeier's car

18   has his brake lights on.  Right?

19   A.    Yes, ma'am.

20   Q.    And the color of those lights, if you compare one car to

21   another, is different?  Katzenmeier's car's lights look more

22   orangy-red.  Right?

23   A.    To my understanding, most brake lights are red.  There

24   are not many variations of brake lights that I see, but yeah,

25   they are both red brake lights.

Cross

1  Q.    Your testimony is the brake light that we see right there

2  on the Chevrolet Equinox is red?

3  A.    Yes, ma'am.

4  Q.    Okay.  And it's the same red as in the -- on the gold

5  car?

6  A.    Yeah.

7  Q.    Does it look the same color to you?

8  A.    Yes.

9        MS. MARRANZINI:  Okay.  I am going to press play.

10       (Whereupon, a video was played in open court but not

11  reported.)

12       MS. MARRANZINI:  I am pausing it again at second 53.

13  BY MS. MARRANZINI:

14  Q.    Do you see the brake light on the white Chevy?  Do you

15  see that it was yellow, that it's illuminating yellow, the

16  right-hand side?

17  A.    From my eyes, that's a red brake.  I am not too sure if

18  you have a different view, but from my point, that's a red

19  brake light.

20       MS. MARRANZINI:  Okay.  I am pressing play again at

21  53.

22       (Whereupon, a video was played in open court but not

23  reported.)

24  BY MS. MARRANZINI:

25  Q.    All right.  So, at this point -- I just paused it at

Groce - Cross

```
 1   1:07 -- we have got Katzenmeier's car that's pulled to the side
 2   and to the front of the car.  Right?
 3   A.    Yes, ma'am.
 4   Q.    Your car is parked behind the white Chevy.  Right?
 5   A.    Yes, ma'am.
 6   Q.    And there is another P.G. County Police vehicle to the
 7   left --
 8   A.    Yes, ma'am.
 9   Q.    -- of the car?
10         And to the right of the car is grass and a sidewalk.
11   Right?
12   A.    Yes, ma'am.
13   Q.    So the car, at this point, is boxed in on the side of the
14   road?
15   A.    Yes, ma'am.
16   Q.    Right?
17         MS. MARRANZINI:  I am going to press play again.
18         (Whereupon, a video was played in open court but not
19   reported.)
20         MS. MARRANZINI:  I am pausing it at one minute 20
21   seconds.
22   BY MS. MARRANZINI:
23   Q.    So, on the left side of the car, we see you interacting
24   at the driver's side window.  Right?
25   A.    Yes, ma'am.
```

```
 1   Q.    We see Officer Katzenmeier on the left in the hat
 2   approaching the vehicle.  Right?
 3   A.    Yes, ma'am.
 4   Q.    And on the right-hand side, there is another officer.
 5         Who is that?
 6   A.    Corporal Tucker.
 7   Q.    Corporal Tucker?
 8   A.    Yes, ma'am.
 9   Q.    And we have previously seen part of his body-worn camera
10   footage.  Right?
11   A.    Yes, ma'am.
12   Q.    And you guys all approached the car more or less
13   simultaneously?  You make the first contact, but you are all
14   kind of approaching together.  Right?
15   A.    Yes, ma'am.
16   Q.    And you are asking everybody to roll down their windows.
17   Right?
18   A.    Yes, ma'am.
19   Q.    And you are asking everybody to put their hands where you
20   can see them?
21   A.    Yes.  In front of them, yes, ma'am.
22   Q.    And there is three people in the car?
23   A.    Yes, ma'am.
24   Q.    And they all comply with the order to put their hands
25   where you can see them?
```

Croce - Cross

1  A.    Yes, ma'am.

2  Q.    The driver puts his hands up in front of him?

3  A.    On the steering wheel, yes.

4  Q.    Mr. Tutt puts his hands up on the dash.  Right?

5  A.    Yes, ma'am.

6  Q.    And the back seat passenger puts his hand up on the -- on

7  the seat in front of him.  Right?

8  A.    Yes, ma'am.

9  Q.    And that's for officer safety.  Right?

10 A.    Officer safety.  The tint makes the vehicle dark inside,

11 so I couldn't really see inside even though it's 1:00 in the

12 afternoon.  So, yeah, just so I can see as I approach, that's

13 something I, you know, do sometimes, yes.

14 Q.    Right.  And you want to make sure that nobody is moving

15 around grabbing anything.  Right?

16 A.    Correct.

17 Q.    Okay.  And we -- we already discussed that you informed

18 the driver two reasons for the stop, which was the windshield

19 tint and the turn signal.  Right?

20 A.    Yes, ma'am.

21 Q.    And then you were about to order everybody out of -- at

22 some point, you order everybody out of the car?

23 A.    Yes, ma'am.

24 Q.    Right?

25            MS. MARRANZINI:  I am going to switch to your

1    body-worn camera, which is Government's 4, and I am going to

2    skip ahead.

3         (Whereupon, a video was played in open court but not

4    reported.)

5              MS. MARRANZINI:  I just skipped ahead to 1:07.

6    BY MS. MARRANZINI:

7    Q.    And we see that you are getting out of your car --

8    A.    Yes, ma'am.

9    Q.    -- to approach the white Chevy.

10         (Whereupon, a video was played in open court but not

11   reported.)

12             MS. MARRANZINI:  I am pausing right there.

13   BY MS. MARRANZINI:

14   Q.    You also asked him to turn the car off.  Right?

15   A.    Yes, ma'am.

16   Q.    And he complied with that request?

17   A.    Mm-hmm.  Yes, ma'am.

18             MS. MARRANZINI:  Pressing play again.

19         (Whereupon, a video was played in open court but not

20   reported.)

21             MS. MARRANZINI:  I am going to pause it right now.

22   BY MS. MARRANZINI:

23   Q.    At this moment, the driver has stepped out of the car.

24   Right?

25   A.    Yes, ma'am.

Cross

1    Q.    But the other two individuals have not yet stepped out of

2    the car?

3    A.    That's correct.

4    Q.    They remain seated?

5    A.    That's correct.

6    Q.    And each of them has an officer next to them?

7    A.    Yes.

8    Q.    Right?

9          MS. MARRANZINI:  Pressing play again.

10         (Whereupon, a video was played in open court but not

11   reported.)

12   BY MS. MARRANZINI:

13   Q.    So we just saw -- I just paused it at one minute and 52

14   seconds.

15         We just saw you pat down the driver.  Right?

16   A.    Yes, ma'am.

17   Q.    We heard Officer Katzenmeier ask everybody inside, Look,

18   if there is anything in the car, now is the time to let us

19   know.  Right?

20   A.    Yes, ma'am.

21   Q.    Okay.  At this point, you don't have any reason to

22   believe that anyone in the car is armed.  Right?

23   A.    No, ma'am.

24         MS. MARRANZINI:  I am pressing play again at 1:52.

25         (Whereupon, a video was played in open court but not

Croce - Cross

1    reported.)

2          MS. MARRANZINI:  Pausing it again at 2:05.

3    BY MS. MARRANZINI:

4    Q.   We just heard Katzenmeier ask if there were any pistols

5    in the car.  Right?

6    A.   Can you play it again?  I didn't hear that part.

7          MS. MARRANZINI:  Going back a couple seconds to 1:59.

8          (Whereupon, a video was played in open court but not

9    reported.)

10   BY MS. MARRANZINI:

11   Q.   And we just heard Katzenmeier say, "Are there any pistols

12   in the car"?

13   A.   Yes, ma'am.

14   Q.   And kind of simultaneously to that, we see you saying to

15   the driver, I am going to have you step back over here.  Right?

16   A.   Yes, ma'am.

17   Q.   And at this point, you are leading him to the curb?

18   A.   Yes, ma'am.

19   Q.   And at this point, which is 13:54:18, as you are leading

20   the driver to the curb, the other two individuals are still in

21   the car?

22   A.   Yes, ma'am.

23   Q.   Right?

24        And -- and at this moment, the officers haven't said

25   "George" yet?

Groce - Cross

1    A.    No, ma'am.

2              MS. MARRANZINI:  Pressing play again.

3         (Whereupon, a video was played in open court but not

4    reported.)

5              MS. MARRANZINI:  I am pausing it.

6    BY MS. MARRANZINI:

7    Q.    Did you just hear them say "George"?

8    A.    Yes, ma'am.

9    Q.    And that's at 13:54:29.  Right?

10   A.    Yes, ma'am.

11   Q.    And you said that it was after that that you started to

12   make, I guess, the move to handcuff this individual.  Right?

13   A.    Yes, ma'am.

14   Q.    But prior to hearing "George," you were already putting

15   him on the curb?

16   A.    Yes, ma'am.

17   Q.    And moving him away from the car?

18   A.    Yes, ma'am.

19   Q.    And, again, as we mentioned, at this point, Mr. Tutt,

20   Tristyn, is still in the passenger -- the front passenger seat

21   of the car?

22   A.    Yes, ma'am.

23   Q.    Right?

24             MS. MARRANZINI:  I am going to switch now to Officer

25   Tucker's body-worn camera that we looked at briefly earlier.

Croce - Cross

```
 1   This is Government's Exhibit 5.  I am going to skip ahead.
 2        (Whereupon, a video was played in open court but not
 3   reported.)
 4            MS. MARRANZINI:  Pausing it.
 5   BY MS. MARRANZINI:
 6   Q.   So this is Officer Tucker.  Right?  Or Corporal Tucker?
 7   A.   Yes.  Yes.  Officer Tucker.
 8   Q.   And we can see that in front of him is another county
 9   police vehicle.  Right?
10   A.   Yes, ma'am.
11   Q.   That's you?
12   A.   That's me, yes.
13   Q.   And another one on the left.  Do you know whose that is?
14   A.   Corporal Clark it should be.  1581.
15            MS. MARRANZINI:  Okay.  Pressing play again at 29
16   seconds.
17        (Whereupon, a video was played in open court but not
18   reported.)
19            MS. MARRANZINI:  I am pausing it at 1:08.
20   BY MS. MARRANZINI:
21   Q.   So, prior to me just pausing it there, we saw that
22   Tristyn Tutt had his hands up on the dash.  Right?
23   A.   Yes, ma'am.
24   Q.   And he kind of moved one of his hands off the dash in a
25   gesture, like to ask a question to Corporal Tucker.  Right?
```

Groce - Cross

```
 1   A.     Yes, ma'am.
 2   Q.     And Corporal Tucker asked him to put his hands back on
 3   the dash.  Right?
 4   A.     Yes, ma'am.
 5   Q.     And he complied with that request?
 6   A.     Yes.
 7          MS. MARRANZINI:  Pressing play again.
 8          (Whereupon, a video was played in open court but not
 9   reported.)
10          MS. MARRANZINI:  Pausing it again.
11   BY MS. MARRANZINI:
12   Q.     We just heard Mr. Tutt -- and this is at 1:26 -- say,
13   "There is weed in here."  Right?
14   A.     Yes, ma'am.
15   Q.     And at this point, you have already started frisking the
16   driver on the other side of the vehicle?
17   A.     Yes, ma'am.
18   Q.     Correct?
19          MS. MARRANZINI:  I am going to press play again.
20          (Whereupon, a video was played in open court but not
21   reported.)
22          MS. MARRANZINI:  Pausing it at 1:34.
23   BY MS. MARRANZINI:
24   Q.     What do we see happening right here with the passenger
25   side door?
```

Croce - Cross

```
 1   A.    Corporal Tucker -- Officer Tucker opening the front
 2   passenger door where Mr. Tutt is sitting.
 3   Q.    And he's going to have him come out of the car.  Right?
 4   A.    Yes, ma'am.
 5         MS. MARRANZINI:  Okay.  I am going to press play one
 6   more time.
 7         (Whereupon, a video was played in open court but not
 8   reported.)
 9         MS. MARRANZINI:  Pausing it.
10   BY MS. MARRANZINI:
11   Q.    So we just heard Mr. Tutt say, "I do got a gun on me."
12   Right?
13   A.    Yes, ma'am.
14   Q.    And that's at 13:54:26.  Right?
15   A.    Yes, ma'am.
16   Q.    And it's right after that that the officers start saying
17   "George"?
18   A.    Yes, ma'am.
19   Q.    And that's to signal to one another --
20   A.    To detain the subjects.
21   Q.    -- to detain the subjects?
22   A.    Yes.
23   Q.    Okay.  Does that mean that a firearm was present, or it
24   could mean something else?
25   A.    It could mean something else, yes.
```

Groce - Cross

```
 1  Q.   Is that the code you use when there is a firearm present?
 2  A.   Yes.
 3  Q.   Okay.
 4  A.   Yep.
 5  Q.   So, at this moment, 13:54:26, by the time Mr. Tutt says,
 6  "I do got a gun on me," you have already ordered everyone out
 7  of the car.  Right?
 8  A.   Yes.  Yes.
 9  Q.   You have -- you have patted the driver down?
10  A.   Yes.
11  Q.   And Tucker has opened the passenger side door?
12  A.   Correct.
13  Q.   Right?  Okay.
14       So I want to go back briefly to your statement of
15  probable cause.
16       Part of your police training is that you are trained to
17  write reports.  Right?
18  A.   Yes.
19  Q.   And you are trained to write statements of probable
20  cause?
21  A.   Yes.
22  Q.   And you understand the importance of those statements
23  being accurate?
24  A.   Yes.
25  Q.   Right?
```

Croce - Cross

```
 1          Because they are reviewed by individuals who were not
 2   present for the interaction?
 3   A.     Correct.
 4   Q.     Like a prosecutor, a judge, a commissioner, people who
 5   might be -- brief indulgence -- considering whether to bring --
 6   whether to authorize charges in the case.  Right?
 7   A.     Correct.
 8   Q.     And you are also trained on when you can and cannot stop
 9   a car.  Right?
10   A.     Yes, ma'am.
11   Q.     And that you have to have a legal basis for stopping a
12   car?
13   A.     Correct.
14   Q.     And that you must have a legal basis for a search if
15   there is a search that takes place?
16   A.     Correct.
17   Q.     And that all of that -- those bases have to be documented
18   in your reports.  Right?
19   A.     Yes.
20   Q.     And, so, in this case, you -- you wrote the report --
21   this is dated March 17th at the bottom -- but when do you -- do
22   you remember when you actually wrote this report?
23   A.     Oh, the day of the incident.  The 17th might be when the
24   item or the document is printed out.
25   Q.     Okay.  But you recall writing this report the same day of
```

1  the incident?

2  A.    Yes, ma'am.

3  Q.    Would that have been when you got back to the station

4  after completing this --

5  A.    Yes, ma'am.

6  Q.    -- stop?

7        And do you review anything prior to writing these

8  reports, like your camera footage or anything like that?

9  A.    Our cameras don't upload -- they really don't upload in

10  time for us to review, you know, so sometimes we just have to,

11  you know, go off of what's occurred on the stop.

12  Q.    Is that what happened in this case, you are going off of

13  your memory?

14  A.    Yes, ma'am.  Yes.

15  Q.    And you are going off of your memory --

16  A.    Or -- and speak with, you know, other officers that was

17  on scene.

18  Q.    And speaking with other officers?

19  A.    Yeah.

20  Q.    Okay.  And this happened approximately ten months ago

21  now, right, in March of last year?

22  A.    Yeah.  Yeah.

23  Q.    And since that point, you haven't submitted any

24  supplemental reports?  This is the statement of probable cause

25  that --

Groce - Cross

1    A.    Correct.

2    Q.    -- exists for this case.  Right?

3          And in this report, we already kind of went over this

4    part, but you mentioned that "I, PFC Groce, observed a white

5    Chevrolet Equinox with a Washington, D.C. registration plate

6    being operated with unauthorized window tinting material and no

7    front registration plate."  Right?

8    A.    Correct.

9    Q.    And then you wrote that officers observed the vehicle

10   make a right turn, and the vehicle failed to give a turn

11   signal?

12   A.    Correct.

13   Q.    Right?

14         You didn't write I observed that?

15   A.    In the statement, no.

16   Q.    You wrote officers observed that?

17   A.    Correct.  I am part of "officers."

18   Q.    Then you wrote, "I conducted a traffic stop on the

19   vehicle."  Right?

20   A.    Yes.

21   Q.    And a couple sentences down, you -- I am going to page 2

22   of this report.  I'm sorry.  That's page 3.  Here is page 2.

23         You indicate in the first sentence, "While conversing

24   with the Driver/Defendant 1 of the vehicle, I could smell the

25   strong odor of fresh marijuana."  Right?

1    A.     Yes.

2    Q.     Then you write, "I advised Driver/Defendant 1 that there

3    was a strong odor of marijuana coming from the vehicle, and

4    Defendant 2 advised officers that there was some marijuana in

5    the vehicle and pointed down towards the front passenger

6    floorboard"?

7    A.     Correct.

8    Q.     Then you write, "The Driver/Defendant 1 was removed from

9    the vehicle to conduct a probable cause search"?

10   A.     Correct.

11   Q.     Right?

12          Did those -- you write those as if those are the order of

13   those events.  Right?  That you advised the driver that there

14   was a strong odor of marijuana, the passenger said there was

15   marijuana, and then you removed them from the vehicle?

16   A.     That's how I wrote it, but from the camera, it obviously

17   happened after I --

18   Q.     Right?

19   A.     -- already asked the driver to step out.  Yes.

20   Q.     We just saw that it was you smelled -- you advised that

21   you smelled marijuana, you ordered them out of the vehicle, and

22   then someone said there is marijuana.  Right?

23   A.     Correct.  Yes.

24   Q.     So this order of events was not accurate from your

25   report?

1  A.    During this time I wrote it, it was from the best of my

2  memory of the stop, yes.

3  Q.    Okay.

4  A.    And from speaking with other officers that was on the

5  scene.

6  Q.    Now, I just have a couple more questions for you, Officer

7  Groce.  Thank you for bearing with me.

8  A.    Yes.

9  Q.    This March 13th was a -- was a Monday.  Right?

10 A.    I don't remember the exact day without my notes.  I'm

11 sorry.

12 Q.    You don't recall?

13 A.    Yes.

14 Q.    Luckily, I have a calendar.

15       MS. MARRANZINI:  Your Honor, I am showing the witness

16 Defense 118, which is a calendar from March of 2023.  And we'd

17 ask Your Honor to take judicial notice of the fact that March

18 13th was a Monday.

19 BY MS. MARRANZINI:

20 Q.    March 13th was a Monday?

21 A.    Yes, ma'am.

22 Q.    This took place in the afternoon before two p.m.?

23 A.    Yes.

24 Q.    Right?  In the middle of the day?

25       Now, you testified that the license plate on this white

Cross

1   Chevy Equinox was a D.C. license plate.  The prosecutor asked
2   you whether you were aware if D.C. requires two plates?
3   A.    Yes, ma'am.
4   Q.    You said yes?
5   A.    Yes, ma'am.
6   Q.    You are not a D.C. police officer.  Right?
7   A.    No.
8   Q.    And this was not in D.C., this --
9   A.    No, it was not.
10  Q.    -- this stop?
11  A.    Correct.
12  Q.    And you are not deputized to enforce D.C. law in
13  Maryland.  Right?
14  A.    Correct.
15  Q.    You are tasked with enforcing Maryland law.  Right?
16  A.    Correct.
17        MS. MARRANZINI:  Court's brief indulgence.
18  BY MS. MARRANZINI:
19  Q.    Were you wearing contact lenses on this date?
20  A.    I believe --
21  Q.    March 13th?
22  A.    I believe so.
23  Q.    You don't -- you are not sure?
24  A.    I always wear either my glasses or contact lenses, so
25  yeah.

1   Q.    Are you required to wear them for your driver's license?

2   A.    Yes.

3           MS. MARRANZINI:  No further questions, Your Honor.

4           THE COURT:  Redirect?

5           MR. AKE:  No redirect, Your Honor.

6           THE COURT:  All right.  Let's hear your argument,

7   then.  That's your --

8           MR. AKE:  I'm sorry, Your Honor?

9           THE COURT:  That's your evidence?

10          MR. AKE:  That is the only evidence.

11          MS. MARRANZINI:  We have a witness.

12          THE COURT:  Oh, you do have a witness?

13          MS. MARRANZINI:  Yes.

14          THE COURT:  I'm sorry.  I didn't realize that.  Why

15  don't we take a break.  I need to get some idea of timing in

16  terms of where we are.  Who is your witness and what's the

17  proffered testimony?

18          MS. MARRANZINI:  The witness is the driver of the

19  vehicle, and it should be about ten minutes.

20          THE COURT:  All right.  Any other witnesses besides

21  that?

22          MR. AKE:  I don't, Your Honor.

23          THE COURT:  Well, let's take a short break because we

24  have been on here now for almost an hour and three quarters, so

25  about a seven- or eight-minute break.

Tutt - Direct

```
 1              MS. MARRANZINI:  How long, Your Honor?
 2              THE COURT:  About seven or eight minutes.
 3              MS. MARRANZINI:  Perfect.  Thank you.
 4         (Recess taken from 3:48 p.m. until 3:57 p.m.)
 5              THE COURT:  Please be seated.
 6         All right.  Ms. Marranzini.
 7              MS. MARRANZINI:  Thank you, Your Honor.  We will be
 8    calling -- Mr. Pilch will handle this one.
 9              MR. PILCH:  Defense calls Alex Tutt.
10              THE COURT:  Swear the witness, please.
11              THE DEPUTY CLERK:  Please raise your right hand.
12           ALEXANDER TUTT, DEFENDANT'S WITNESS, SWORN
13              THE DEPUTY CLERK:  Thank you.  You may be seated.
14         Please state and spell your first and last name for the
15    record.
16              THE WITNESS:  First name Alexander,
17    A-L-E-X-A-N-D-E-R; last name Tutt, T-U-T-T.
18              THE DEPUTY CLERK:  Thank you.
19              THE COURT:  You may inquire.
20                         DIRECT EXAMINATION
21    BY MR. PILCH:
22    Q.   Good afternoon, Mr. Tutt.
23         How do you know Tristyn Tutt?
24              THE COURT:  You have to speak a little louder if you
25    will, please.
```

1           THE WITNESS:  I am one of Tristyn's older brothers.

2    BY MR. PILCH:

3    Q.    And do you have a car?

4    A.    Yes.

5    Q.    And where is that car registered?

6    A.    In Washington, D.C.

7    Q.    Did you own and operate that car on March 13th, 2023?

8    A.    Yes.

9    Q.    And what is the tag of the car that you were operating on

10   that date?

11   A.    GN1890.

12   Q.    And bringing your attention to that day, do you remember

13   who you were with?

14   A.    Yes.

15   Q.    Who were you with?

16   A.    I was with Tristyn and another occupant, Cambrick

17   [phonetic].

18   Q.    Where was Tristyn sitting in the car?

19   A.    In the front right passenger seat.

20   Q.    And did Tristyn have permission to be in your car?

21   A.    Yes.

22   Q.    Had Tristyn been in your car before?

23   A.    Yes.

24   Q.    Do you remember being pulled over by the police that day?

25   A.    Correct.  Yes.

1   Q.    And do you remember the reasons cited by the police for

2   pulling you over?

3   A.    They said I didn't use my right turning signal and

4   because I had a window tint or windshield tint.

5   Q.    I'd like to draw your attention to what's been previously

6   admitted as Defense Exhibit 102.

7         Do you recognize this?

8   A.    Yes.

9   Q.    Is this a fair and accurate depiction of where you were

10  on March 13th, 2023, before being pulled over?

11  A.    Yes.

12  Q.    Where was your car parked before you started driving?

13  A.    It was parked on Parkway Terrace Drive near Tristyn's

14  apartment.

15  Q.    Where is Tristyn's apartment, if you could identify it on

16  the map?

17  A.    It's about right here (indicating), I believe.  I can't

18  tell because it's so far back.  I think it's around right here

19  (indicating).

20  Q.    Where were you when you noticed the police behind you?

21  A.    About right here (indicating).

22  Q.    And you were driving on Parkway Terrace Drive?

23  A.    Correct.

24  Q.    Towards Silver Hill Road?

25  A.    Correct.

1   Q.    Okay.  What happened when you reached Silver Hill Road?

2   A.    I had came to a complete stop and I had made a right

3   turn.

4   Q.    Is it possible to turn left at the intersection of

5   Parkway Terrace Drive and Silver Hill Road?

6   A.    No.

7   Q.    And you used your turn signal when you turned right, you

8   just testified?

9   A.    That's correct.

10  Q.    How do you know?

11  A.    I typically obey the traffic laws, and I also have a

12  toddler so it's just safe to use my turning signal at all

13  times.

14  Q.    Did you come to a complete stop --

15  A.    Yes.

16  Q.    -- at Parkway Terrace Drive and Silver Hill Road?

17  A.    Yes.

18  Q.    Okay.  And you took a right onto Silver Hill Road.

19  Correct?

20  A.    Yes, a right turn.  Correct.

21  Q.    Where was the next turn that you made?

22  A.    I had made a right-hand turn on Silver Hill Road, so it

23  was about right here (indicating).

24  Q.    And what did you do when you arrived at the intersection?

25  A.    So, I had the right-of-way to make the left turn.  It was

Tutt - Direct

```
 1    a green light.  So I just made a U-turn onto Silver Hill Road
 2    going the other direction.
 3    Q.    And the notation you made, is that the intersection of
 4    Navy Day Drive and Silver Hill Road.  Correct?
 5    A.    I'm sorry.  Can you repeat that?  I can't really hear
 6    you.
 7    Q.    The notation that you made on the screen is at the
 8    intersection of Navy Day Drive and Silver Hill Road on this
 9    map, Exhibit 102?
10    A.    Yes.
11    Q.    Why did you take a U-turn?
12    A.    Because I was heading to Suitland Parkway and it's the
13    only way to get to that direction.
14    Q.    For how long have you had a license to drive?
15    A.    Two-and-a-half years.
16    Q.    Had you ever been cited for a traffic infraction prior to
17    March 13th, 2023?
18    A.    No.
19    Q.    Okay.
20          MR. PILCH:  No further questions.
21                      CROSS-EXAMINATION
22    BY MR. AKE:
23    Q.    Good afternoon, Mr. Tutt.
24          Where were you heading that day?
25    A.    To pick up my toddler.
```

Nutt - Cross

```
 1  Q.    To where?
 2  A.    To pick up my toddler from school.
 3            MR. PILCH:  Objection.  Beyond the scope of direct.
 4            MR. AKE:  This goes to --
 5            THE COURT:  Well, everything is in play.  Go ahead.
 6  Overruled.
 7  BY MR. AKE:
 8  Q.    Are you aware -- were you aware your front seat passenger
 9  was carrying a machine gun that day?
10            MR. PILCH:  Objection.
11            THE COURT:  Overruled.
12            THE WITNESS:  No.
13  BY MR. AKE:
14  Q.    Were you aware your rear seat passenger --
15            THE COURT:  I'm sorry.  What was your answer?  You
16  were not aware or you were aware?
17            THE WITNESS:  I wasn't, no.
18  BY MR. AKE:
19  Q.    Were you aware your rear seat passenger was carrying
20  ammunition?
21            MR. PILCH:  Objection.  It's beyond the scope.
22            THE COURT:  Overruled.
23            THE WITNESS:  No.
24  BY MR. AKE:
25  Q.    Were you aware there was a half pound of marijuana on the
```

Nutt - Cross

```
 1    front floorboard?
 2              MR. PILCH:  Objection.  Beyond the scope.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  No.
 5              THE COURT:  No?
 6              THE WITNESS:  No.
 7              THE COURT:  In the car at all, anywhere in the car,
 8    you were not aware of marijuana?
 9              THE WITNESS:  No, I wasn't.
10              MR. AKE:  No further questions, Your Honor.  Thank
11    you.
12              THE COURT:  Were you smoking marijuana?
13              THE WITNESS:  Huh?
14              THE COURT:  Were you smoking marijuana?
15              THE WITNESS:  No.
16              THE COURT:  Did officers say to you:  Is there
17    marijuana in this car?
18              THE WITNESS:  He said there was a smell, but --
19              THE COURT:  What did you say?
20              THE WITNESS:  I didn't smell anything.
21              THE COURT:  Did you say there is no marijuana, or you
22    just didn't respond?
23              THE WITNESS:  I honestly can't remember, but I never
24    told him there was.
25              THE COURT:  Well, you didn't smell it, but he said, I
```

1   smelled it, and your response was you don't remember what you

2   said in response.  Is that right?

3            THE WITNESS:  Yes.

4            THE COURT:  All right.  That's all I have.  Thank

5   you.  You may step down unless you have redirect.

6            MR. PILCH:  Nothing.  Thanks.

7            THE COURT:  Any other witnesses?

8            MS. MARRANZINI:  No, Your Honor.

9            THE COURT:  All right.  It's your burden.  Let me

10  hear from you.

11            MR. AKE:  Thank you, Your Honor.

12       Your Honor, we have laid out my arguments pretty

13  thoroughly in the brief, so just to be very brief, there was

14  plenty of objective cause to support a traffic stop in this

15  case.  While we focused on the -- the turn -- the lack of a

16  turn signal, there was also -- the government asserts that

17  there is no problem with the other two grounds that Officer

18  Groce cited the driver for.  Both the -- the lack of a display

19  of a front license plate, even though the car was registered in

20  D.C., Maryland law is still very clear that it is generally

21  applicable to all cars, if they are required to display

22  permanent license plates, that they -- they need to display

23  those license plates, so that was an additional ground that's

24  -- that's very clear.

25       And while it may be arguable whether or not the window

1    tint citation could have been issued, it's the government's

2    position that *Baez v. State*, the Court of Special Appeals

3    decision in Maryland, is binding authority and gives officers

4    at least the authority to investigate.

5              THE COURT:  Is it -- I thought there was one of the

6    opinions -- was it Chuang's opinion? -- that said there is

7    contrary authority from Maryland, and he wanted to follow a

8    more recent case that said that -- I guess it was a tinting

9    case -- that you can't stop for tinting or something?

10             MR. AKE:  Your Honor, I think there was -- he --

11             THE COURT:  I don't know if you have to distinguish

12   Chuang's case.  It may be wrongly decided or differently

13   decided.

14             MR. AKE:  I think --

15             THE COURT:  Just what is your position?

16             MR. AKE:  Your Honor, the -- the government's

17   position is that we read Judge Chuang's opinion that he -- he

18   was basing his decision on the *Johnson* case, the 2001 Fourth

19   Circuit case, which our position is that that turned on an

20   interpretation of South Carolina law.  It was analogous

21   circumstances, but it wasn't clear to the Court -- or the panel

22   considering *Johnson* that the officers, under South Carolina

23   law, could legally pull over an out-of-state vehicle for a

24   window tint violation.

25             THE COURT:  Do you cite proper authority for the

1  proposition that Maryland law can stop a vehicle from out of

2  state?

3           MR. AKE:  And that is the -- that is the *Baez v.*

4  *State*.

5           THE COURT:  The which?

6           MR. AKE:  The *Baez v. State* case.  That's a state

7  case, Court of Special Appeals.

8           THE COURT:  Well, *Baez* is the one I guess Chuang said

9  is not operative anymore.

10          MR. AKE:  He -- he said that it had been preempted by

11 *Johnson*, by the -- the Fourth Circuit case.

12          THE COURT:  And you are saying it hasn't been?

13          MR. AKE:  Correct.  And in -- our position was the

14 same one that was adopted by Judge Grimm in a case prior to the

15 case Judge Chuang ruled in, and he had -- he had essentially,

16 and, we would argue, correctly determined that -- that because

17 *Baez v. State* makes clear that the officers have the right to

18 at least do an investigative stop even if it's an out-of-state

19 vehicle, that under *Ker v. California*, because states are in

20 the best position to determine what is lawful in the state,

21 unless the state law is clearly unconstitutional, that the

22 federal courts will defer to -- to the state's determination of

23 whether or not law enforcement officers have -- or what

24 constitutes a legal stop for -- for state law enforcement

25 officers.

1          All of this said, there only needed to be one lawful

2   ground to make the stop.  The government's position is that the

3   -- the video footage from Officer Groce's video never -- while

4   -- while we clearly admit that the view was obstructed, that

5   during the moments that it wasn't obstructed and while the --

6   the subject vehicle was in the turn, the -- the light was not

7   flashing.  That position is bolstered by Officer Katzenmeier's

8   contemporaneous broadcast over the radio that the vehicle had

9   both failed to make a stop and to -- to signal properly.  So I

10  -- I don't think the Court needs to go beyond that especially

11  with the video evidence in play.

12         Separately, once Officer Groce approached the car, there

13  is no problem, under -- under Fourth Circuit law or the Supreme

14  Court law, on whether or not he could order the driver out of

15  the vehicle or the rest of the passengers out of the vehicle to

16  conduct a further investigation once he had smelled the strong

17  odor of marijuana, which, at the time, possession of anything

18  -- well, it was still a criminal offense, but it was -- you

19  know, if they are smelling that much, he -- he could further --

20  he could legally investigate and ask all the vehicle occupants

21  to -- to exit the vehicle.

22         They did make a decision to handcuff the -- the occupants

23  once a firearm had been admitted to, and then, you know, they

24  were taking that additional step for -- to control the

25  situation.  But the government submits that -- that at no point

1    in the -- in the progress of this investigative stop that

2    ultimately yielded the firearm in Mr. Tutt's waistband was

3    there any illegality.

4        So, based on -- we will submit on the motions at this

5    point, Your Honor, subject to any reply to defense argument.

6            THE COURT:  Let me be clear.  Was it a half a -- how

7    much marijuana was found in the front?

8            MR. AKE:  It was just below 250 grams, so a half

9    pound of marijuana, Your Honor.

10            THE COURT:  Half pound.  Was it in a transparent bag

11    or what?

12            MR. AKE:  In glass baggies, glassine baggies.  Ziploc

13    bags.

14            THE COURT:  Transparent baggies?

15            MR. AKE:  Yes, Your Honor.

16            THE COURT:  Was there one or were there several?

17            MR. AKE:  Your Honor, I am consulting the report that

18    defense entered as Government's Exhibit 100 -- or Defense

19    Exhibit 100.  It appears that the -- in the bookbag were eight

20    heat-sealed baggies containing suspected marijuana, a digital

21    scale with marijuana residue, and the clear baggies.

22            THE COURT:  Are you reading from the probable cause?

23            MR. AKE:  I am.  Page 3, Your Honor, of Exhibit 100,

24    Defense Exhibit 100.

25            THE COURT:  Multiple clear baggies.  Right?  237

1  grams, a white plastic bag where defendant was seated

2  containing multiple clear baggies, okay, suspected marijuana.

3  And then in the bookbag: eight heat-sealed baggies containing

4  suspected marijuana and one baggie containing suspected

5  marijuana, a digital scale with marijuana residue weighing 246

6  grams; approximate street value of everything, $4,920.  Inside

7  the center console: two heat-sealed baggies containing ten

8  grams of suspected marijuana.

9      Okay.

10          MR. AKE:  Yes, Your Honor.

11          THE COURT:  Ms. Marranzini.

12          MS. MARRANZINI:  Thank you, Your Honor.

13      So the -- the first question in this case is whether

14  there was a valid traffic stop.  The government has offered

15  three potential bases for the traffic stop: the window tint

16  violation, the lack of a front license plate, and then the

17  failure to use a turn signal before turning.  The first two,

18  the window tint and the front license plate, can be resolved as

19  a matter of law because the Maryland Transportation Code simply

20  does not regulate either the window tint or the number of

21  license plates of vehicles that are registered out of state.

22  And both of those issues were addressed by Judge Chuang in the

23  *Brooks* opinion that was relatively recent.  That case is not

24  meaningfully distinguishable in any way from this case.  That

25  case --

1      THE COURT:  Because I am not bound by what Judge

2  Chuang --

3      MS. MARRANZINI:  You are not bound by Judge Chuang.

4  You are bound by the -- the Fourth Circuit, and what -- what

5  Judge Chuang's interpretation was, was that the Fourth

6  Circuit's decision in *Frank Johnson* was on-point precedent and

7  is controlling in federal court; whereas, the *Baez vs. State*

8  opinion is state court precedent that is binding in state

9  court.

10      THE COURT:  Let me just ask you a question if you

11  folks are relying on that.  How would you be able to know

12  whether the car was -- the tint was registered in Virginia

13  unless you could stop the car and investigate?  There are cases

14  out there that I read that says it's reasonable to stop to find

15  out the answer to that question, which Judge Luttig said was

16  dispositive.  Sort of curious.

17      MS. MARRANZINI:  Which judge who said?

18      THE COURT:  Which Judge Luttig in *Johnson* said was

19  dispositive.  He didn't know when he stopped -- the officer who

20  affected the stop, whether it was, in fact, violative of

21  Virginia.  I think that was the --

22      MS. MARRANZINI:  It was a South Carolina plate in the

23  *Frank Johnson* case.  And there, the -- the Court held --

24      THE COURT:  South Carolina.  Whatever the state was,

25  one of the things that was missing was the lack of knowledge on

1  the part of the officer to determine its status of registration

2  in the other state, but how would you know that without

3  stopping him?

4          MS. MARRANZINI:  Well, that one was -- that was a

5  traffic stop of a Georgia registered car within the State of

6  South Carolina, and the officer stopped the car for South

7  Carolina window tint.  And the Fourth Circuit essentially held

8  you -- first of all, you can't just stop a car to check.  The

9  Fourth Circuit has addressed that separate issue in *United*

10 *States vs. Feliciana* in 2020.

11         THE COURT:  I agree.  It's -- it's just more a point

12 to muse upon.  I found a case or two where you -- you stopped

13 to find out whether, in fact, something is registered in the

14 other state.

15     The other curious question is hearing the officer testify

16 that he knew that D.C. did also require two license plates, and

17 I am not sure the extent to which a local officer in Maryland

18 is supposed to enforce D.C. law, but that's another kind of

19 academic question I think.

20         MS. MARRANZINI:  I was curious about that, too, and

21 for the reply, we checked the Maryland -- so, the Maryland

22 officer is authorized to enforce Maryland law, and I checked

23 whether there was any provision of the Maryland Transportation

24 Code that would authorize an officer to, by cross-reference of

25 a, you know, an adjoining district's laws, enforce that

1  district's laws, and the answer was -- was no.  And we cited

2  that in our reply.

3      Essentially, the -- the Maryland Traffic Code says that

4  for a -- a car that has to be registered in Maryland and for

5  which Maryland requires two plates, you have to use two plates.

6  But it says, with respect to cars that are registered out of

7  state but driven within the state, and that's under

8  Transportation Article 13-402.1, it says, "A non-resident may

9  drive or permit the driving of a foreign vehicle in this state

10  if it is registered in and displays current registration plates

11  issued for it in the owner's place of residence and carries a

12  current registration card."

13      So, essentially, Maryland's requirement for out-of-state

14  vehicles is that it show its license plate and carry a

15  registration card.  And, so, under that transportation article,

16  Mr. Tutt's car was facially compliant with the license plate

17  laws of Maryland as they apply to out-of-state registered

18  vehicles.

19      THE COURT:  What do you want to say about the turn

20  signal issue, which is really the key issue, it seems to me,

21  here?

22      MS. MARRANZINI:  The turn signal seems to be the --

23  the key factual issue here, and on that point, there is two

24  things I wanted to address.

25      First is whether he was even required to use a turn

1  signal because at that stop sign, the only direction that a car

2  in that lane can go is to the right, and, as we reviewed with

3  the witness, the transportation article says that when -- and I

4  will just go to it so I can quote it directly.  This is

5  Transportation Article Section 21-604.  It says that, under

6  subsection (c), "A person may not, if any other vehicle might

7  be affected by the movement, turn a vehicle until he gives an

8  appropriate signal in the manner required by this subtitle,"

9  and then the manner required is for 100 feet prior to the turn.

10       And, so, because this is a -- a stop sign at which you

11  literally can only turn right -- you can't go straight, you

12  can't go left -- there is no conceivable way that the turn

13  could affect any other --

14       THE COURT:  Who testified to that, by the way?  Did

15  you testify to that or did the officer?

16       MS. MARRANZINI:  The officer --

17       THE COURT:  He said you can't go straight.  I thought

18  you said you couldn't go left?

19       MS. MARRANZINI:  The officer testified that you can't

20  go straight and you can't go left.

21       THE COURT:  Well, let me ask you:  Would the officer

22  be expected to make that nice distinction between what you just

23  said and what the 100 feet signal -- I guess I shouldn't apply

24  604(d) because there is another section that says whatever you

25  are saying now -- does an officer have to make that kind of

1   fine distinction if he is going to make a stop?

2          MS. MARRANZINI:  I think on -- on this point, it's

3   not a matter of whether he should make that distinction but

4   whether the Court can make that distinction, whether, as a

5   matter of law, a turn signal is required at that stop.  And

6   because of the specific nature of that stop sign, which is

7   relatively specific, then, you know, there is no way that a

8   turn -- the lack of a turn signal could affect another driver.

9          But separately, even if Your Honor determines, you know,

10  he -- he should have used a turn signal at that stop, there is

11  -- the question becomes:  Did officers actually observe that

12  infraction?  And there is two sources of evidence that we have

13  for that.

14         First are these -- these videos.  We have a -- a

15  different array of body camera videos and cruiser cam videos.

16  Crucially, what we lack is a cruiser camera video from

17  Katzenmeier's car, and his is the car that was following right

18  behind the white Chevy, so we don't have a video that shows

19  head on the brake lights and the turn signals as this car

20  approaches the turn.

21         We also don't have testimony from Officer Katzenmeier,

22  who was the primary percipient witness with respect to this

23  turn signal.  What we have is a video from Officer Groce's car,

24  which, as he conceded, is at a different vantage point from

25  where his eyes were.  And my view of the video is you can never

1  see continuously whether or not a turn signal was illuminated

2  because the view of the Chevy is obstructed by Katzenmeier's

3  car.

4        So then what we have is the -- the testimony -- I am

5  backing up a little.  You know, we saw that clearly Groce's car

6  was always behind Katzenmeier's car, and for, like, 99 percent

7  of the video, Katzenmeier's car is obstructing the view of the

8  back of the white Chevy.

9        It's only until the Chevy has actually already turned

10  that you can start to see its brake lights and its turn signal,

11  and there is no testimony that a turn signal would still need

12  to be illuminated after you have already initiated your turn.

13       So what's missing crucially is any evidence that prior to

14  that turn being initiated, that he failed to put on his turn

15  signal.  We simply can't see it from the video, and we don't

16  have before us the witness who would have been able to explain

17  what happened.

18       And turning briefly back to that witness who would have

19  been able to explain what happened, as we -- as we mentioned at

20  -- at the bench, we -- we objected to the -- to Your Honor

21  accepting the truth of the statement fail -- no stop at the

22  stop sign, no turn signal, as uttered by Katzenmeier.  We

23  understand, you know, the effect on the listener, being Groce,

24  but we vehemently urge the Court not to accept the truth of

25  Katzenmeier's statement because he was not a witness that came

1   to court and he was not subject to cross-examination.

2        Had he been subject to cross-examination, we would have

3   had a lot of questions for him regarding his history of

4   official misconduct, which include at least four sustained

5   Internal Affairs allegations, all of which resulted in some

6   form of discipline, and at least one of which was the result of

7   him making a statement to the IAD -- the Internal Affairs

8   committee that was completely undermined by evidence that was

9   presented against him.

10       And we are not talking about trivial infractions.  We are

11  talking about allegations of domestic violence, of sending

12  threatening text messages.  He was convicted of speeding 124

13  miles per hour in a 65 mile per hour zone in -- in Virginia.

14  And he was suspended for multiple of these incidents, he was

15  demoted for one of these incidents, and he was removed from the

16  promotional cycle for one of these incidents.  And --

17            THE COURT:  And, therefore, I should conclude that he

18  lied in this case?

19            MS. MARRANZINI:  We are not asking you to conclude

20  that he lied in this case.  We are saying that if he had been a

21  witness in this case, we would have had, you know, the right to

22  attack his -- his credibility, and Your Honor --

23            THE COURT:  Only to a limited extent.  I seriously

24  doubt that I would have let you get into the 120 miles an hour

25  speeding.  That's the problem of trying five cases in one.  The

1   judge really is not obliged to let you do that.

2       I saw the video.  I didn't see illuminated the turn, and

3   the turn was going on.  I don't read the statute to mean you

4   don't have to have your turn signal on as you are turning.  I

5   saw that.  That is buttressed by Katzenmeier's testimony.

6       So, can you then attack his speeding while he was an

7   officer and these four or five other disciplinary matters?  I

8   mean, I really don't think -- I am pretty sure I wouldn't have

9   let you get into all that.  But --

10      MS. MARRANZINI:  That could be, but we haven't,

11  obviously, had the opportunity nor the -- the need to fully

12  flesh out the possible impeachment.  You know, to a limited

13  extent, under Rule 806, we are allowed to attack a declarant

14  for whom a hearsay statement has --

15      THE COURT:  Subject to the Court's ruling.

16      MS. MARRANZINI: -- been offered -- right, subject to

17  the Court's rulings.  But my point is if they had brought him

18  as a witness to this turn signal, we would have engaged in this

19  exercise of -- of attempting to impeach him.  Maybe the Court

20  would have accepted it, maybe not, but that would have been

21  something that happened in court.

22      Because the -- he wasn't brought to testify, his

23  statement is essentially being presented immune from any of

24  this potential impeachment, and -- and they shouldn't be able

25  to circumvent the fact that this is someone with a, like, a

1  pretty significant record who isn't being offered to testify,

2  he isn't being subject to cross-examination, and -- but, yet,

3  nevertheless, his statement is being offered.

4        THE COURT:  I take your point.

5        MS. MARRANZINI:  And -- and one of the other aspects

6  of the potential impeachment is whether there is any, you know,

7  bias or -- or motive under the Fourth Circuit's precedent in

8  *United States vs. Ferris* from 2017.

9        So -- but we -- I think Your Honor understands we are

10 urging the Court not to just accept at face value this

11 statement made by Katzenmeier.

12        Your Honor mentioned we watched the video multiple times;

13 you never saw the turn signal being illuminated.  And my

14 response to that is:  Because we could never see the turn

15 signal because it was obstructed in the video by Katzenmeier's

16 car until the very end once it's already started to make the

17 turn, and as Groce accepted during his testimony, a turn signal

18 blinks on and off, it's not consistently illuminated, so if we

19 are watching a slow-motion video that's kind of like chugging

20 through the -- the frames of the video and we can only see the

21 turn signal for one moment, the fact that that turn signal is

22 not illuminated at one moment doesn't mean that the turn signal

23 hadn't been blinking on and off.

24        And, so, you know, it's -- it's the government's burden

25 to establish that there was reasonable suspicion to believe

1   that a traffic infraction had occurred, and I think, at best,

2   with this evidence, it's a tie, right, whether there was a turn

3   signal illuminated or not, and so we'd urge the Court to find

4   that there was no -- not sufficient evidence of an infraction.

5        And then when it comes to the -- Your Honor brought this

6   up earlier -- the collective knowledge doctrine or the fellow

7   officer rule, whether -- whether Officer Groce can take what

8   Officer Katzenmeier said and act on it, and the -- the way that

9   the collective knowledge doctrine has been articulated and

10  delineated by the Fourth Circuit is most clearly expressed in

11  *United States vs. Massenburg*, a 2011 opinion, in which the

12  Court says, quote, The collective knowledge doctrine, as

13  annunciated by the Supreme Court, holds that when an officer

14  acts on an instruction from another officer, the act is

15  justified if the instructing officer had sufficient information

16  to justify taking such action herself, and, so, in this very

17  limited sense, the instructing officer's knowledge is imputed

18  to the acting officer.

19       So, in this case, we are talking about Katzenmeier being

20  the instructing officer, his knowledge gets imputed to Groce,

21  and so the question is whether Katzenmeier, in fact, had a

22  sufficient basis to stop someone for a turn signal violation.

23       And what the Fourth Circuit has said is that the

24  collective knowledge doctrine, quote, does not permit us to

25  aggregate bits and pieces of information from among different

1  officers, nor does it apply outside the context of communicated

2  alerts or instructions.

3          THE COURT:  So his eyewitness testimony doesn't

4  count?  He said, I saw that he didn't illuminate his turn

5  signal.  I saw that.  That's eyewitness testimony.

6          MS. MARRANZINI:  That is eyewitness testimony, and we

7  are arguing that his testimony wasn't persuasive in the sense

8  that it is contradicted by the video which clearly shows --

9          THE COURT:  Well, it's not really contradicted by the

10  last part of the video.  It is -- it doesn't show 100 feet.  I

11  can see that.  But the last part shows the car into its turn

12  with no signal being given.  That's what it shows.

13          MS. MARRANZINI:  Right.

14          THE COURT:  That's what I deduce.

15          MS. MARRANZINI:  It shows -- it shows the car already

16  in a turn, and at that -- in that split second where -- before

17  the car gets obstructed by another parked car, no turn signal

18  is illuminated.  But at no moment prior to the car initiating

19  the turn can the video show that the -- the turn signal exists

20  at all.

21          THE COURT:  Interesting argument.

22          MS. MARRANZINI:  We understand that Your Honor

23  apparently disagrees.

24          THE COURT:  Let's wind up.

25          MS. MARRANZINI:  Well, so, even if, you know, the

1    Court determines that there was a valid traffic stop, the

2    question becomes whether this seizure that was lawful for a

3    traffic stop escalated into an unlawful arrest that was

4    unsupported by probable cause.

5         And here, the law, under the Fourth Circuit's decision in

6    *Park v. Shiflett*, the test for whether someone is in custody or

7    under arrest is whether, under the totality of circumstances,

8    the suspect's freedom of action is curtailed to a degree

9    associated with formal arrest.  And the Fourth Circuit has

10   cautioned that the intrusion created by a *Terry* stop should be

11   minimal.

12        THE COURT:  Can't you order people out of the car in

13   a *Terry* stop just for -- for safety purposes?

14        MS. MARRANZINI:  There -- there are --

15        THE COURT:  I mean, you could have -- there is

16   arguably a further suspicion here because of the smell of

17   marijuana.  But that aside, do you even need that to order

18   people out of the car?  In other words, do you need it to do a

19   pat down?

20        MS. MARRANZINI:  What they need to do a pat down is

21   reasonable suspicion that the person is armed or dangerous.

22        THE COURT:  Didn't they ask -- they said that they

23   asked the defendant whether he had a weapon, and he said, I

24   have got a gun.

25        MS. MARRANZINI:  Well, several seconds before that,

1  Officer Groce patted down the driver of the vehicle, and

2  Officer Groce testified that at that moment, he did not have

3  reasonable suspicion to believe that anyone in the car was

4  armed or dangerous, and so that pat down, kind of on its terms,

5  we are not representing the driver --

6          THE COURT:  I am really asking a question about

7  interpretation of law.  I don't think, with the traffic stop,

8  you have to have reasonable suspicion to believe there is a

9  weapon.  As part of a traffic stop, you can stop somebody and

10 ask whether they have a weapon or do a pat down to see if they

11 do have a weapon.  If you know they have a weapon, you can

12 probably arrest them right then and there.

13      But just as far as it being investigatory, you don't have

14 to have probable cause to order somebody out of a car in

15 connection with a traffic stop, do you?

16         MS. MARRANZINI:  There is support for the proposition

17 that officers can order somebody out of the car in connection

18 with a traffic stop.

19         THE COURT:  All right.

20         MS. MARRANZINI:  I have never seen authority

21 suggesting that the officer can pat down somebody during a

22 traffic stop without reasonable suspicion that they are armed

23 or dangerous.

24         THE COURT:  Well, it's an interesting proposition,

25 but the reason you can do it is because you are fearful of

1    somebody having a weapon.  That's the whole concept.

2         MS. MARRANZINI:  Right.  But Groce testified he had

3    no reason to believe that the driver was armed or dangerous;

4    yet, he patted him down anyway.  He had the right to ask anyone

5    in the car whether --

6         THE COURT:  He has to take their word for it?

7         MS. MARRANZINI:  I am not saying he has to take their

8    word for it.  I am just saying that at the moment he decided to

9    do a pat down, he didn't -- he admittedly didn't have

10   reasonable --

11        THE COURT:  Well, you can check that out because it

12   doesn't make a lot of sense that you can order somebody out for

13   a protective search to believe that they are armed.  But I am

14   not sure that's really the problem here anyway because there is

15   evidence that there was further suspicion when -- that there

16   was a smell of marijuana, and there, apparently, was a lot of

17   marijuana in the car.

18        Now, your last witness was, frankly, incredible.  I have

19   got to tell you that.  With all of those baggies and scales and

20   he says -- he doesn't say I didn't say there wasn't marijuana.

21   He says, I don't remember what I said or how I responded.  He

22   didn't smell it, he said.  He didn't say there isn't any

23   marijuana in the car.  Wouldn't that further justify Groce and

24   the others to go forward?  Very careful not to say I didn't

25   have it.

1              MS. MARRANZINI:  I didn't hear --

2              THE COURT:  There was a lot of marijuana in the car

3    by what I just read.

4              MS. MARRANZINI:  I didn't hear the driver respond --

5    I didn't hear the officers ask the driver --

6              THE COURT:  No.  I asked him -- I asked your witness:

7    Did you deny that there was marijuana in the car?

8              MS. MARRANZINI:  And he said he didn't remember.

9              THE COURT:  He said, I don't remember.  I don't know.

10             MS. MARRANZINI:  Right.  But -- but from my

11   recollection of the videos, he wasn't asked that question and

12   wasn't -- he didn't deny it, nor did he admit -- like, he

13   wasn't asked that question before he was taken out of the car.

14             THE COURT:  Okay.  Well, even if he said, I smell

15   marijuana, and he said, I didn't -- I don't know what he did --

16   I don't think he said he responded at all -- he said he didn't

17   smell it, but that would have been -- the reasonable response

18   would have been, There is no marijuana here.  Of course, there

19   was plenty of marijuana.

20             MS. MARRANZINI:  He didn't say there was no

21   marijuana.  He said he --

22             THE COURT:  "The reasonable response would have been"

23   were my words.

24             MS. MARRANZINI:  Oh, okay.  Well, I did want to point

25   out that -- you know, the officer obviously testified that he

1    smelled marijuana.  The -- the evidence was that the marijuana

2    was contained in heat-sealed bags and inside Ziploc bags.  And

3    so --

4            THE COURT:  That's why I find his -- his sense of

5    there not being marijuana there and not responding that there

6    was no marijuana, he obviously couldn't -- very unlikely --

7    would unlikely do that with the rather substantial presence of

8    marijuana in the car.

9            MS. MARRANZINI:  Well, I am just not sure how much it

10   would smell --

11           THE COURT:  Over 500 grams.

12           MS. MARRANZINI: -- if it's within heat-sealed bags

13   contained inside another bag inside someone's backpack.  But --

14           THE COURT:  Well, in the front seat, there was a bag

15   where -- by the way, is he related?  I think he's related to

16   the defendant.  Is he a brother?

17           MS. MARRANZINI:  Brother.

18           THE COURT:  They have the same last name.

19           MS. MARRANZINI:  Brother.

20           THE COURT:  Doesn't know anything that's going on.

21   Right?

22       Okay.  All right.  Finish up, please.

23           MS. MARRANZINI:  So, our -- our second contention is

24   even if the Court were to find the traffic stop valid, that the

25   Court could consider different factors, including the number of

1  officers that were present, whether commands, force, or

2  restraints were used, and -- and whether people were moved from

3  the scene, amongst other factors, to determine that by the time

4  Mr. Tutt was being asked out of the car, which is when he said

5  "I do have a gun on me," that he was already essentially under

6  arrest, and, at that point, there was not probable cause for

7  his arrest.

8             THE COURT:  Okay.

9             MS. MARRANZINI:  Thank you, Your Honor.

10            THE COURT:  All right.  Thank you.

11        I want you to address that last point, Mr. Ake.  It's

12  sort of interesting.  You can order people out of the car,

13  according to Ms. Marranzini, but you can't find out whether

14  they have a weapon or not, so why do you order them out of the

15  car?

16            MR. AKE:  No, Your Honor.  And -- and it was clear

17  that the officers were concerned about their personal safety by

18  the questions they asked about is -- and Officer Groce --

19            THE COURT:  Does he have a gun?

20            MR. AKE:  Do you have anything that's going to poke

21  me, stick me, blow me up?  You know, they were -- they

22  articulated, you know, what they were concerned about.

23        And the -- the pat down, at least of the -- the driver,

24  you know, again, it's a sequence of events.  Under *Maryland v.*

25  *Wilson*, a Supreme Court case out of 1997, regardless of what

1    the purpose of the stop is, officers can order the occupants of

2    a vehicle out until the completion of the stop.

3        Officer Groce had already smelled marijuana, he's

4    concerned about the circumstances with the heavily tinted

5    windshield -- windows, so he instigates a -- a pat down of --

6    of the driver, but, again, here the -- it's not the driver

7    that's asserting the -- the constitutional right.  It's -- it's

8    Mr. Tutt, who was not patted down.

9        So, I understand their -- their argument -- the gist of

10   their argument is that, you know, just by the fact that he had

11   seen somebody else being patted down, he anticipated that was

12   going to happen.  But, in any case, he volunteered that he had

13   a weapon on him.

14       I did want to just briefly go back.  Ms. Marranzini talks

15   about the -- the license plate display requirement.  She cited

16   Section 402.  That was not what the driver was cited for.  He

17   was cited -- he was cited with a violation of -- of Section

18   411, which unambiguously says, "On a vehicle for which two

19   registration plates are required, one plate shall be attached

20   on the front and the other on the rear of the vehicle."

21       It does not -- that section does not narrow its

22   application to cars that are registered in Maryland.  So, it --

23   it applies generally.  You cannot just drive a vehicle, say,

24   with no plates.  Officers can clearly stop a -- a car that's

25   not displaying any plates.  Even though that's -- it -- it

1    turns out that the vehicle is registered in a different state,

2    they can clearly cite it for -- for failing to -- failing to

3    comply with its -- its own state's regulations.  That does not

4    deputize them into enforcing the foreign state's law.  That is

5    merely enforcing the requirement that it either display one or

6    two plates as is required by the state of its registration.

7        So, I just want to make that clear, that there is an

8    unambiguous second ground.  Even -- the government acknowledges

9    that, you know, Mr. -- Judge Chuang has made -- whether or not

10   the -- the window tint violation at least called into question,

11   that window tint violation case, though, that Judge Chuang

12   considered, was a case with a parked vehicle in a private

13   residence, and that, really, his -- his decision really did

14   turn on the fact that the -- the officers who were approaching

15   the vehicle had not seen the vehicle operate on the public

16   roadways, and, yet, that was the -- the reason that they cited

17   was the window tint, and that clearly only applies to vehicles

18   that are being operated on the roadways.

19       So he did articulate other grounds that -- that he -- he

20   found unreasonable, but, again, I think that is a

21   distinguishable case.

22       And Judge Grimm's 2021 case, under very analogous

23   circumstances to this current one, which was *U.S. v. Devonta*

24   *Johnson*, he -- he found that *Devonta Johnson*, that

25   notwithstanding the -- the *Frank Johnson* case out of the Fourth

1    Circuit in 2001, that under Maryland law, as opposed to under
2    South Carolina law, an investigative stop was permissible under
3    controlling state authority, and that did not violate the U.S.
4    Constitution.  So under *Ker v. California*, that was proper and
5    -- and -- and it should survive federal scrutiny.

6         Your Honor, I -- I agree -- I -- I did want to make the
7    point that we -- you know, Ms. Marranzini said several times
8    that there is no evidence that -- that the Equinox did not
9    fully make -- make a full stop or signal.  Obviously, the Court
10   appreciates that -- the contemporaneous recording of what
11   Officer Katzenmeier observed and called out over the radio,
12   which certainly falls within the -- the ambit of what the
13   Courts have articulated as -- as the -- providing that common
14   -- common picture that the officers can share and that that
15   knowledge is imputed to the officer that ultimately makes the
16   decision to do the traffic stop, I think that clearly falls
17   within the ambit, and that evidence is already before the
18   Court.

19        So, for those reasons, the -- the government's position
20   is that the Court should fully affirm this based on the
21   legality of the stop as well as all police actions subsequent
22   to the stop that led to the recovery of the firearm in
23   question.

24        Thank you, Your Honor.

25             THE COURT:  All right.  Tristyn Tutt is charged with

1    one count as a felon in possession of a firearm, in violation

2    of 18, United States Code, Section 922(g)(1), and for illegal

3    possession of a machine gun, in violation of 18, United States

4    Code, Section 922(o) in Count Two.  He is before the Court on

5    his own motion to suppress evidence.

6         The evidence shows that on March 13th, 2023, officers

7    from the Prince George's County Police Department saw a white

8    Chevrolet Equinox with a rear D.C. license plate leaving the

9    apartment complex on Silver Hill Road or off Silver Hill Road

10   in Suitland, Maryland.  The vehicle had dark window tinting,

11   that it apparently displayed no front license plate as well,

12   but Officer Katzenmeier, who was not in court but was part of

13   the collective knowledge base that Officer Groce, the arresting

14   officer on, relied on, he was driving an unmarked vehicle,

15   followed the white Equinox, and, according to him, he observed

16   that the Equinox made a turn on Silver Hill Road without fully

17   stopping at the stop sign, but, more importantly, without

18   signalling its return.  And then he followed -- he reported

19   that he observed the traffic violation on his radio that

20   Officer Groce picked up.

21        Groce was following Katzenmeier's vehicle, activated his

22   own emergency lights, and initiated a traffic stop, for which a

23   number of officers came.

24        When Groce approached the driver -- driver's window, who

25   was the brother of the defendant, the defendant being in the

1    passenger side, the driver rolled down his window, and Officer

2    Groce says he observed Tutt in the passenger seat; also, that

3    he smelled a strong odor of weed or marijuana.  Ordered the

4    occupants to show their hands, ordered the driver out, and

5    inquired whether the occupants had any guns or any such items.

6         But once the passengers were out, initiated a pat down of

7    the defendant, he said, I have got a gun, meaning he had a gun,

8    and, in fact, the men were then cuffed and taken into custody.

9    I don't think the third participant in the car was charged with

10   anything, but the driver was charged with multiple traffic

11   offenses, and the defendant was charged with the offenses that

12   I recited earlier.

13        This is obviously a classic Fourth Amendment case, and,

14   therefore, the classic law, if you will, applies throughout.  A

15   seizure is affected when a car is stopped.  There must be

16   reasonable grounds of suspicion to justify an investigatory

17   stop.  It's not a stop for probable cause and belief of

18   contraband of the individual.  Questioning is allowed that goes

19   beyond even the original purpose of the stop.  Frankly,

20   questioning is allowed in connection with the stop.  Further

21   questioning was always allowed to allow a search to go beyond

22   the basic purpose of the stop.  And police may always take

23   reasonable actions to protect themselves after an unlawful stop

24   of a motor vehicle.

25        So what you have here is clearly, really, although

1  disputed, not really for me, as a trier of fact, a difficult

2  proposition; that the defendant was in a vehicle driven by,

3  apparently, his brother that did not make the -- give the

4  required turn signal for 100 feet prior to the stop, including

5  the stop and the turn.  Unlikely that at the instant that the

6  turn occurs, that one -- one's signal is not required.  The

7  Court observed from the video that it was not, in fact, active

8  at the time that the turn was happening.

9       And then Katzenmeier, who was part of the collective

10 knowledge base, which is entirely permissible in these police

11 searches, indicated that he saw that the driver had not stopped

12 at the stop sign or giving his signal within the 100 feet, so

13 that would suffice to give the arresting Officer Groce a basis

14 to pursue the investigatory stop.  And the turn alone would do

15 it.

16      In the Court's view, I don't need to decide ultimately,

17 but I would say I probably would hazard, as an independent

18 grounds entirely, that there was probable -- that there was

19 reasonable cause, if you will, reasonable suspicion, based on

20 the tinted windows and the failure to display both license

21 plates -- the arresting officer said he was aware it was a D.C.

22 license, but D.C. required two licenses to be displayed -- that

23 wouldn't suffice to be independent grounds, but the most

24 important and really dispositive ground is the failure to

25 observe the traffic requirement to give the turn signal at the

1   stop.

2       So that would justify the investigatory stop.  It doesn't

3   matter how many officers showed up.  It doesn't matter that

4   they were patrolling a high crime area.  All that is risk for

5   argument somewhere else, but not in this court, and not with

6   regard to the guilt or innocence of the defendant.  And so all

7   that happened thereafter was reasonable.  The -- the fact of

8   the matter is that, as I say, the stop was justified, ordering

9   the driver out, ordering the passengers out, also justified,

10  but multiply so because they were concerned about their safety

11  to determine whether someone had a gun or not.

12      Frankly, Mr. Alexander Tutt's testimony was incredible.

13  Hard to believe that with all that marijuana, he could say,

14  Well, I couldn't smell it, with the implication clearly that

15  there was no marijuana, and I, frankly, didn't find anything he

16  said of any particular merit.  It in no way affects the

17  outcome.

18      That said, there is really no basis, in the Court's view,

19  to suppress the evidence.  The Court denies the motion to

20  suppress.  The matter will go to trial.

21      Anything further?

22          MR. AKE:  No, Your Honor.  Thank you.

23          MS. MARRANZINI:  No, Your Honor.

24          THE COURT:  All right.  Thank you, folks, for your

25  presentation.

1          (The proceedings were concluded at 4:52 p.m.)

2

3                    C E R T I F I C A T E

4

5               I, Renee A. Ewing, an Official Court Reporter

6    for the United States District Court for the District of

7    Maryland, do hereby certify that the foregoing is a true and

8    correct transcript of the stenographically reported proceedings

9    taken on the date and time previously stated in the above

10   matter; that the testimony of witnesses and statements of the

11   parties were correctly recorded in machine shorthand by me and

12   thereafter transcribed under my supervision with computer-aided

13   transcription to the best of my ability; and that I am neither

14   of counsel nor kin to any party in said action, nor interested

15   in the outcome thereof.

16

17

                  /s/ Renee A  Ewing
18
                  Renee A. Ewing, RPR, RMR, CRR
19                Official Court Reporter
                  February 13, 2025
20

21

22

23

24

25